MICHAEL C. GERAGHTY
ATTORNEY GENERAL
Seth M. Beausang
Lauri J. Adams
Mary Ann Lundquist
Assistant Attorney Generals
1031 W. 4th Avenue, Suite 200
Anchorage, Alaska 99501
Phone: (907) 269-5274
Fax: (907) 278-7022
seth.beausang@alaska.gov
lauri.adams@alaska.gov
mary.lundquist@alaska.gov
**Attorneys for Plaintiff**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>HILLARY RODHAM CLINTON, in her )<br>official capacity as United States Secretary of )<br>State, UNITED STATES ENVIRONMENTAL )<br>PROTECTION AGENCY, LISA P. )<br>JACKSON, in her official capacity as )<br>Administrator, United States Environmental )<br>Protection Agency, UNITED STATES )<br>DEPARTMENT OF HOMELAND )<br>SECURITY, JANET NAPOLITANO, in her )<br>official capacity as Secretary, United States )<br>Department of Homeland Security, UNITED )<br>STATES COAST GUARD, and ADMIRAL )<br>ROBERT J. PAPP, JR., in his official capacity )<br>as Commandant of the United States Coast )<br>Guard, )<br>Defendants. ) | Case No.   3:12-cv-00142-SLG<br><br><br><br>**FIRST AMENDED<br>COMPLAINT FOR<br>DECLARATORY AND<br>INJUNCTIVE RELIEF** |

## I.    INTRODUCTION

1.    The State of Alaska ("Alaska," or the "State") seeks relief from the enforcement of a North American emission control area ("ECA") in the waters off the coast of Alaska.  Unless enjoined, the Environmental Protection Agency ("EPA") and the United States Coast Guard ("Coast Guard"), a division of the Department of Homeland Security ("DHS"), will begin jointly enforcing the ECA on August 1, 2012.  As of that date, vessels operating within 200 miles of the Southeast and Southcentral Alaska coastlines will be required to use fuel with a sulfur content that does not exceed 10,000 parts per million ("low-sulfur fuel").  In 2015, the limit will be lowered to 1,000 parts per million sulfur content.  Low-sulfur fuel is more expensive, and more difficult to obtain, than the fuel currently used by many marine vessels operating in the waters off the coast of Alaska.  Requiring the use of low-sulfur fuel in the ECA will greatly increase operating costs for vessels that supply Alaska's residents with basic necessities, and for cruise ships that facilitate Alaska's tourism industry.  Enforcement of the ECA will therefore have an immediate and adverse effect on Alaska's citizens and economy.

2.    The extension of the ECA to Alaska was unlawful because two-thirds of the U.S. Senate did not consent to that extension as required by the U.S. Constitution.  Under the Constitution's Treaty Clause, a treaty cannot bind the U.S., and is not enforceable as domestic law, unless two-thirds of the Senate give advice and consent to the treaty.  U.S. Const. art. II, § 2, cl. 2 (President has the power, "by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur").  Upon information and belief, the Secretary of State purported

2

to accept (or failed to reject) the ECA as an amendment to Annex VI of the International Convention for the Prevention of Pollution from Ships ("MARPOL"), an international treaty to which the U.S. is a party. The Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. §§ 1909(b) & (c), empowered the Secretary of State, following consultation with the Administrator of EPA or the Secretary of DHS, to take appropriate action concerning the ECA, or reject the ECA following consultation with the Secretary of DHS. The Secretary of State's acceptance of the ECA as a treaty amendment to MARPOL, without the advice and consent of two-thirds of the Senate, was unconstitutional. APPS, by delegating authority to the executive branch to accept a treaty amendment without the advice and consent of two-thirds of the Senate, is also unconstitutional.

3. On April 30, 2010, EPA promulgated final rules requiring that vessels operating in the ECA use low-sulfur fuel beginning August 1, 2012. 40 C.F.R. § 1043.60. EPA received many comments on these rules criticizing the decision to extend the ECA to Alaska waters, including from the Governor on behalf of the State of Alaska. The comments argued, among other things, that there was no scientific basis for extending the ECA to Alaska. EPA responded that these comments were beyond the scope of its rulemaking because the extension of the ECA was separately required by a proposed amendment to Annex VI. EPA contended the amendment would be binding on the U.S. and EPA. Because the extension of the ECA to Alaska was unlawful, and the Annex VI amendment was not validly enacted, EPA does not have authority to enforce

3

the ECA in Alaska. Accordingly, EPA and the Coast Guard should be enjoined from enforcing the ECA in Alaska.

## II. PARTIES

4. Plaintiff, the State of Alaska, is a sovereign state of the U.S. that has compelling economic and environmental interests in the management and regulation of marine vessel air emissions within its jurisdiction and in the areas extending 200 miles from its coastline. The State's interests extend to the management and regulation of vessels that bring goods to Alaska and that facilitate the State's tourism industry. Increased regulation of these vessels increases the costs of bringing goods to Alaska, in effect operating as a tax on all Alaskans. Increased regulation of these vessels also harms Alaska's tourism industry. In each instance, such increased regulation has a direct, substantial, and harmful effect on Alaska's citizens and economy.

5. Defendant Hillary Rodham Clinton is named solely in her capacity as United States Secretary of State. When the U.S. received the proposal from the International Maritime Organization ("IMO") to extend a North American ECA to the waters off the coast of Alaska, Secretary Clinton failed to make a declaration that the U.S. did not accept that extension. By doing so, Secretary Clinton purported to bind the U.S. to an ECA that extended to Alaska.

6. Defendant Environmental Protection Agency is a federal agency that administers and enforces federal environmental laws. APPS empowers EPA to promulgate rules to carry out the provisions of Annex VI, and gives EPA and DHS joint authority to implement and enforce Annex VI.

4

7.     Defendant Lisa P. Jackson is named solely in her official capacity as EPA Administrator.   Administrator Jackson intends to enforce the ECA in Alaska, despite the absence of a scientific basis for extending the ECA to Alaska, because the ECA is purportedly a lawful amendment to Annex VI.

8.     Defendant Department of Homeland Security is a federal agency whose mission is to ensure a homeland that is safe, secure, and resilient against terrorism and other hazards.   APPS gives EPA and DHS joint authority to implement and enforce Annex VI.

9.     Defendant Janet Napolitano is named solely in her official capacity as Secretary of DHS.   Secretary Napolitano intends to enforce the ECA in Alaska, despite the absence of a scientific basis for extending the ECA to Alaska, because the ECA is purportedly a lawful amendment to Annex VI.

10.     Defendant United States Coast Guard is a division of DHS whose mission is to safeguard U.S. maritime interests.   The Coast Guard and EPA have entered into a Memorandum of Understanding agreeing to jointly implement and enforce the ECA.

11.     Defendant Robert J. Papp, Jr. is named solely in his official capacity as Commandant of the Coast Guard.   As Commandant, Admiral Papp is responsible for all world-wide Coast Guard activities.   Admiral Papp intends to enforce the ECA in Alaska, despite the absence of a scientific basis for extending the ECA to Alaska, because the ECA is purportedly a lawful amendment to Annex VI.

5

### III. JURISDICTION

12. <u>Subject Matter Jurisdiction</u>. The Court has jurisdiction under 28 U.S.C. § 1331 to redress the violations alleged in this Complaint of Article II, Section 2 of the U.S. Constitution.

13. <u>Declaratory and Injunctive Relief</u>. The State seeks declaratory and injunctive relief to protect its citizens and economy from enforcement of the ECA in the waters off the coast of Alaska. Unless enjoined, EPA and Coast Guard will begin enforcing the ECA in these waters on August 1, 2012 with direct, substantial, and harmful effects on Alaska's citizens and economy. As a result, an actual, justiciable controversy exits between the State and Defendants. The State seeks the requested relief under 28 U.S.C. §§ 2201-02 and Fed. R. Civ. P. 57. The State has no other remedy to redress the unlawful acts alleged in this Complaint.

### IV. VENUE

14. <u>Venue</u>. Venue is proper in the District of Alaska under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred here, and a substantial part of the property at issue exists here.

### V. BACKGROUND

15. <u>MARPOL</u>. The IMO adopted the MARPOL Convention in 1973 to establish international standards governing marine pollution from ships. The IMO amended MARPOL with the Protocol of 1978. In 1980, two-thirds of the Senate gave advice and consent to the Protocol of 1978, making the U.S. a member party to

6

MARPOL.  MARPOL sets forth amendment procedures in Article VI of the Protocol of 1973, as amended by the Protocol of 1978.

16.  Annex VI.  In 1997, the IMO adopted Annex VI to MARPOL (attached hereto as Exhibit A).  Annex VI imposes limits on sulfur and nitrogen oxide emissions from vessels and provides procedures for designating ECAs.  Only a party to Annex VI may apply for an ECA designation.  Two-thirds of the Senate gave its advice and consent to Annex VI in April 2006.  In 2008, the IMO amended Annex VI to impose more stringent standards on sulfur emissions from marine engines.  These amendments (found in Annex VI, Regulation 14) require vessels operating in ECAs to use fuel containing a sulfur content that does not exceed 10,000 parts per million (i.e., low-sulfur fuel) beginning in July 2010.  In 2015, the limit will be lowered to 1,000 parts per million sulfur content.

17.  Annex VI, Appendix III.  Appendix III to Annex VI sets forth certain mandatory criteria that parties to Annex VI must satisfy when proposing an ECA. Under Appendix III to Annex VI, ECA proposals must include:

.1   a clear delineation of the proposed area of application, along with a reference chart on which the area is marked;

.2   the type or types of emission(s) that is or are being proposed for control (i.e. NOx or SOx and particulate matter or all three types of emissions);

.3   a description of the human populations and environmental areas at risk from the impacts of ship emissions;

.4   an assessment that emissions from ships operating in the proposed area of application are contributing to ambient concentrations of air pollution or to adverse environmental impacts.  Such assessment shall include a description of the impacts of the relevant emissions on human health and the environment, such as adverse impacts to terrestrial and

7

aquatic ecosystems, areas of natural productivity, critical habitats, water quality, human health, and areas of cultural and scientific significance, if applicable. The sources of relevant data including methodologies used shall be identified;

.5 relevant information pertaining to the meteorological conditions in the proposed area of application to the human populations and environmental areas at risk, in particular prevailing wind patterns, or to topographical, geological, oceanographic, morphological, or other conditions that contribute to ambient concentrations of air pollution or adverse environmental impacts;

.6 the nature of the ship traffic in the proposed Emission Control Area, including the patterns and density of such traffic;

.7 a description of the control measures taken by the proposing Party or Parties addressing land-based sources of NOx, SOx and particulate matter emissions affecting the human populations and environmental areas at risk that are in place and operating concurrent with the consideration of measures to be adopted in relation to provisions of regulations 13 and 14 of Annex VI; and

.8 the relative costs of reducing emissions from ships when compared with land-based controls, and the economic impacts on shipping engaged in international trade.

Appendix III further provides that the "geographical limits of an Emission Control Area will be based on the relevant criteria outlined above, including emissions and deposition from ships navigating in the proposed area, traffic patterns and density, and wind conditions."

## VI. THE JOINT U.S.-CANADA ECA PROPOSAL, AND THE SECRETARY OF STATE'S UNLAWFUL ACCEPTANCE THEREOF

18. <u>EPA's Role in the Joint U.S.-Canada ECA Proposal</u>. Under APPS, EPA must consult with the Secretary of State on amendments to Annex VI, including amendments that would create an ECA. To that end, in 2008, upon information and

8

belief, EPA began working on an ECA proposal. Around that time, EPA contacted an employee at the Alaska Department of Environmental Conservation ("DEC") about a hypothetical North American ECA. In response, on October 1, 2008 the employee sent EPA a document entitled "Statement in Support of EPA Considering Alaska as Part of a Marine Emission Control Area" (the "Statement"). In the Statement, the DEC employee advocated including all of Alaska in an ECA. Among other things, the employee cited a 2007 study purporting to show some damage from sulfur pollution to lichen near downtown Juneau, Alaska. The employee then attempted to draw a connection between damage to lichen in Juneau and threats to the Southern Alaska Peninsula Caribou Herd, which the employee stated "has been decreasing in size, exhibiting poor calf survival and low pregnancy rates which are typically a sign of dietary distress." In fact, there is no connection between the two, as the Southern Alaska Peninsula Caribou Herd lives some 1,000 miles away from the site of the Juneau lichen study. The employee did not send the Statement to EPA on DEC letterhead. Upon information and belief, DEC's Commissioner, Governor Palin, then-Lt. Governor Parnell, Alaska's Department of Law, and Alaska lawmakers did not know EPA had contacted the employee, did not see the Statement before it went to EPA, and did not endorse the views set forth in that document.

19. EPA's January 2009 Regulatory Update. In January 2009, after Annex VI became binding domestic law by virtue of its acceptance by two-thirds of the Senate, but before the U.S. and Canada submitted the North American ECA application, EPA issued a Regulatory Update entitled "Frequently Asked Questions about the

9

Emission Control Area Application Process."  In the Update, EPA revealed that, "[i]deally," it wanted to include Alaska in the ECA it was considering.  Yet, EPA acknowledged that to include Alaska it would "have to provide information that demonstrates a need for control, as specified in the criteria for ECA designation."  In other words, EPA admitted that in order to include Alaska, the U.S. would have to comply with Appendix III to Annex VI.  (Because APPS requires the Secretary of State to take "appropriate action" concerning ECA proposals, or reject those proposals, it is the Secretary of State's duty to ensure compliance with Appendix III.  EPA's statutory role is to consult with the Secretary of State on ECA proposals.)  EPA further admitted that it did not yet have a sufficient scientific basis to include Alaska in the ECA.  EPA said it was "challenging" to include Alaska "because, although our emissions modeling includes all 50 states, our air quality modeling does not extend beyond the 48 contiguous states." Due to the lack of air quality modeling outside the Lower 48, EPA said "it will be necessary to find other ways to measure the health and environmental impacts of marine emissions on health and human welfare outside the continental United States."  However, EPA never completed the necessary air quality modeling for Alaska, and it never provided a sufficient Alaska-specific scientific basis for extending the ECA to Alaska.

20.    The U.S.-Canada ECA Proposal.  On April 2, 2009, just three months after EPA said in its Regulatory Update that it lacked the science to support an ECA in Alaska, the U.S. and Canada jointly submitted a petition to the IMO to create a North American ECA that included waters off the coast of Alaska (attached hereto as Exhibit B).  The U.S. proposed including the waters off the Southeast and Southcentral

10

Alaska coasts, but not the waters next to Western Alaska, the Aleutian Chain, or northern Alaska, because "[f]urther information must be gathered to properly assess these areas." To demonstrate that the ECA was needed to protect human health and the environment, as required by Appendix III, the U.S. used a "state-of-the-art modelling technique[]" called the Community Multi-scale Air Quality ("CMAQ") model. The model "simulated the multiple physical and chemical processes involved in the formation, transport, and deposition" of pollutants. However, the CMAQ model did not include Alaska. The sole support for extending the ECA to Alaska was as follows: the U.S. (1) claimed it had estimated the amount of pollutants emitted by marine vessels in the entire ECA (without providing a breakdown for the Alaskan portion of the ECA); (2) noted that most of the population of Alaska lives near the coast; and (3) claimed that winds "typically have an easterly component" near those populated areas. Based on that, the U.S. concluded that "it is reasonable to expect ships are contributing to ambient air concentrations of ozone and $PM_{2.5}$ in Hawaii and Alaska, even though our modelling does not allow us to quantify these effects." The only other "evidence" cited by the U.S. for extending the ECA to Alaska was the false connection drawn by the DEC employee between evidence of sulfur emissions impacting lichen communities near Juneau and the state of the Southern Alaska Peninsula Caribou Herd. In no way did the U.S.-Canada ECA proposal to extend the ECA to Alaska comply with Appendix III to Annex VI.

21. <u>APPS</u>. Congress passed APPS in 1980 to implement the Protocol of 1978. Congress has amended APPS several times since, including in 2008, when it

amended APPS to permit EPA and DHS to enforce Annex VI. Under APPS, EPA has both regulatory and enforcement authority, the latter of which EPA shares with DHS.

22.    Procedures Set By APPS for Amending MARPOL. Section 1909 of APPS sets forth procedures for accepting amendments to MARPOL. Section 1909(a) provides that amendments to MARPOL generally must receive the advice and consent of the Senate:

> A proposed amendment to the MARPOL Protocol received by the United States from the Secretary-General of the [IMO] pursuant to Article VI of the MARPOL Protocol, may be accepted on behalf of the United States by the President following advice and consent of the Senate, except as provided for in subsection (b) of this section.

Section 1909(b) purports to provide an exception to the advice and consent requirement for certain MARPOL amendments, whereby the Secretary of State may take appropriate action concerning such amendments without the involvement of the Senate:

> A proposed amendment to Annex I, II, V, or VI to the Convention, appendices to those Annexes, or Protocol I of the Convention, received by the United States from the Secretary-General of the [IMO] pursuant to Article VI of the MARPOL Protocol, may be the subject of appropriate action on behalf of the United States by the Secretary of State following consultation with the Secretary [of DHS], or the Administrator [of EPA] as provided for in this chapter, who shall inform the Secretary of State as to what action he considers appropriate at least 30 days prior to the expiration of the period specified in Article VI of the MARPOL Protocol during which objection may be made to any amendment received.

Section 1909(c) allows the Secretary of State to "make a declaration that the United States does not accept an amendment proposed pursuant to Article VI of the MARPOL Protocol."

12

23.    The IMO Approved, and the Secretary of State Accepted, the North American ECA.  In March 2010, the IMO amended MARPOL Annex VI to include the 200-mile North American ECA, imposing the new low-sulfur fuel requirement on vessels operating in the ECA, effective August 1, 2012.  Under the terms of MARPOL, an amendment to MARPOL that is adopted is sent to the MARPOL parties for acceptance. APPS required the Secretary of State to take appropriate action concerning the ECA proposal, or reject the ECA proposal (or at least reject its extension to Alaska).  Instead, on information and belief, the Secretary of State accepted the ECA as an amendment to Annex VI.

24.    The Secretary of State Violated APPS by Accepting an Alaskan ECA That Did Not Comply With Annex VI, Appendix III.  In § 1909(b), Congress gave the Secretary of State limited authority to act on an amendment to Annex VI without the involvement of the Senate.  To act without the involvement of the Senate, the Secretary of State must either take "appropriate action" concerning the amendment following consultation with DHS or EPA, or reject the amendment following consultation with DHS.  33 U.S.C. §§ 1909(b) & (c).  At a bare minimum, the Secretary of State's duty to take "appropriate action" concerning a proposed amendment to Annex VI includes the duty to ensure that the amendment complies with Annex VI, including Appendix III. Appendix III sets forth in detail the mandatory criteria that an ECA proposal must include, and provides that "geographical limits of an Emission Control Area will be based on the relevant criteria."  Here, the Secretary of State failed to ensure that the North American ECA proposal complied with Appendix III to the extent the proposal advocated

13

including Alaskan waters in the ECA. And, in fact, the ECA proposal did not comply with the Appendix III requirements insofar as the proposal failed to provide a justification for including Alaska in the ECA.

## VII. THE SECRETARY OF STATE'S ACCEPTANCE OF THE ECA WAS UNCONSTITUTIONAL

25. <u>Treaties Must Receive Advice and Consent of Two-Thirds of the Senate</u>. Article II, Section 2 of the Constitution empowers the President to make treaties "by and with the Advice and Consent of the Senate … provided two thirds of the Senators present concur." Although no court has definitively decided whether all treaties must receive advice and consent of two-thirds of the Senate to become binding domestic law, leading commentators believe they must. *See, e.g.,* Laurence H. Tribe, *Taking Text and Structure Seriously: Reflections on Free-Form Method in Constitutional Interpretation*, 108 Harv. L. Rev. 1221 (1995). The plain language of the Treaty Clause, and its history, support that conclusion.

26. <u>The ECA is an Amendment to Annex VI, Which Two-Thirds of The Senate Have Not Accepted</u>. The supermajority requirement in Article II, Section 2, is an important check on executive power, and also protects less populous states, like Alaska, from the whims of more populated areas. *See, e.g.*, *The Federalist* No. 64, at 375-76 (John Jay) (Isaac Kramnick ed. 1978) ("The power of making treaties is an important one, especially as it relates to war, peace, and commerce; and it should not be delegated but in such a mode, and with such precautions, as will afford the highest security that it will be exercised by men the best qualified for the purpose, and in the manner most

14

conducive to the public good."); *id.* at 379 (arguing that the Treaty Clause was well designed to ensure that corrupt agreements would not be made, because "who can think it probable that the President and two thirds of the Senate will ever be capable of such unworthy conduct"); *The Federalist* No. 75, at 426 (Alexander Hamilton) (arguing in favor of the President and the Senate having a joint role in treaty making, because "joint possession of the power in question, by the President and Senate, would afford a greater prospect of security, than the separate possession of it by either of them," and against the House having a role, because "the multitudinous composition of that body, forbid us to expect in it those qualities which are essential to the proper execution of such a trust"). Two-thirds of the Senate never accepted the designation of the ECA. As such, the ECA is not a valid and binding treaty amendment to Annex VI.

## VIII. EPA RELIED ON THE ECA DESIGNATION IN ITS RULEMAKING

27.  <u>EPA's Notice of Proposed Rulemaking</u>. On August 28, 2009, EPA published a Notice of Proposed Rulemaking ("NPRM") on its website, which included rules to implement the not-yet-finally-approved North American ECA. EPA established a one-month comment period. The NPRM noted that the U.S.-Canada ECA proposal was pending with the IMO, and that the ECA proposal included the waters off the Southeast and Southcentral Alaska coasts. The NPRM also acknowledged that the ECA proposal had to comply with the "criteria and procedures for ECA designation [] set out in Appendix III to MARPOL Annex VI," and listed a summary of those criteria. As for the justification for including Alaska in the ECA, the NPRM cited only the Juneau lichen

15

study from the DEC employee's "Statement," and the nonsensical link between that study and the Southern Alaska Peninsula Caribou Herd.

28.     Alaska's Elected Officials Express Concerns.     Alaska's elected officials immediately expressed concerns over the NPRM's lack of scientific or environmental data (including any ambient air quality data) to justify including Alaskan waters in the ECA.  For example, Governor Parnell, on behalf of the State, submitted a letter to EPA dated September 28, 2009 (attached as Exhibit C), in which he asked EPA to exclude Alaska from the ECA.  He pointed out that the "best air quality data available for Southeast Alaska" had "concluded the concentrations of measured air pollutants were appreciably below state and national air quality standards."  Governor Parnell also noted that "the federal register notice reflects a misunderstanding of Alaska's geography and ecosystems," as the notice relied on the Juneau lichen study to demonstrate potential damage to a caribou herd that lives "some 1,000 miles away, across the Gulf of Alaska (and outside the emission control area)."  Governor Parnell emphasized "the absence of any air quality modeling for Alaska, and EPA's admission that demonstrating the need for a control area outside the contiguous 48 states will be challenging."  He also stressed the ECA's economic impact to Alaska, given that the State relies heavily on the shipping and cruise industries to deliver necessary commodities to its citizens and to sustain its vital tourism industry.  Similarly, U.S. Senator Lisa Murkowski submitted a letter to EPA dated September 28, 2009 (attached as Exhibit D), noting the lack of any air quality data in the NPRM showing a need for an ECA in Alaska, and pointing out that the data EPA did rely on—the Juneau lichen study—rested on inaccurate assumptions.  Senator

16

Murkowski asked EPA to delay implementing and enforcing the ECA in Alaska "until the agency has completed Alaska-specific air quality, health and environmental impact studies." U.S. Senator Mark Begich submitted a letter to EPA dated September 28, 2009 (attached as Exhibit E), asking EPA to delay implementation of its rule "in Alaska until the appropriate science has been completed." Others raised similar concerns.

        29. <u>EPA's Summary and Analysis of Comments</u>. In December 2009, EPA responded to comments on its NPRM. In response to the comments critical of the decision to extend the ECA to Alaska, EPA deferred to the U.S.-Canada ECA proposal, claiming comments critical of the geographic boundaries of the ECA were irrelevant because the ECA proposal did "not [come] within the scope of this final rulemaking." In other words, EPA's position was that it did not decide in the NPRM to extend the ECA to Alaska, and it did not have the power to amend the ECA proposal. Still, EPA provided very minimal and confusing responses to the comments about the lack of scientific data showing a need for an ECA off the Alaska coastline. For example, EPA argued that the ECA was needed in Alaska in part because although Alaska "enjoys air quality that is generally cleaner than our National Ambient Air Quality Standards," in 2009 portions of the Fairbanks North Star Borough—a community hundreds of miles and several mountain ranges from the ECA—were designated nonattainment for one of EPA's new air quality standards.

        30. <u>EPA's Final Rule</u>. On April 30, 2010, shortly after the IMO amended Annex VI to designate the North American ECA, EPA published its Final Rule. EPA identified APPS as the statutory basis for its rules to implement the ECA. Among

17

other things, EPA's rules incorporated and implemented Annex VI's low-sulfur requirements in the ECA. 40 C.F.R. § 1043.60(b). EPA contended that the ECA is a valid treaty amendment to Annex VI, and the legal authority for its rules. Under the terms of Annex VI, the low-sulfur requirements for the ECA become effective twelve months after the ECA becomes effective, i.e., on August 1, 2012. EPA's rules implementing and enforcing the low-sulfur rules in the ECA are also effective August 1, 2012. Because two-thirds of the Senate never accepted the designation of the ECA, and because the ECA was not lawfully accepted by the Secretary of State, EPA's reliance on the ECA to adopt the new low-sulfur rules is unconstitutional and unlawful.

## VI. EFFECTS OF THE ECA ON ALASKA

31. <u>Alaska Cargo Industry</u>. It is estimated that the Port of Anchorage serves 85 percent of Alaska's population as the entry point for 90 percent of the commodities entering Alaska. That cargo comprises, among other things, groceries, fuel, retail goods, cars, school supplies, and construction material and equipment, including essential supplies to the U.S. military. Many of these goods are also purchased by the State. Companies that ship goods to Alaska estimate that ECA's low-sulfur requirements will increase shipping costs to Alaska by 8%. Those increased costs will be passed on to consumers, effectively resulting in a tax increase on all Alaskans. EPA itself has recognized that shipping companies forced to travel through the ECA will pass the costs of complying with EPA's regulations on to Alaskan consumers in the form of higher prices. This added shipping cost will burden all Alaskans, including the State, who already pay higher rates than the rest of the U.S. for groceries and other essential goods.

18

The residents of remote Alaskan villages will be particularly hard hit given their very high cost of living, due in part to the high cost of shipping goods to villages.

32.     <u>Alaska Cruise Ship Industry</u>.  Many of Alaska's communities, and in particular Southeast Alaska, depend heavily on the cruise ship industry to generate economic activity.  The economic activity generated by the cruise ship industry is crucial to local businesses.  That activity also generates tax revenues that are critical to local and State governments.  It is estimated that nearly 14 percent of all employment in Alaska is directly tied to the tourism industry.  The Alaska cruise industry has estimated that a 15 percent decline in cruise ship visitors would result in 585,000 fewer visitors to Alaska ports.  The industry further estimated that a drop in visitors of this magnitude would cause a decrease of approximately $150 million in income for Alaska workers and a decline of approximately $180 million in direct spending by Alaska tourists.  One industry estimate is that EPA's rules will increase cruise passenger costs by $12 to $16 per passenger day, adding approximately $86 to $112 to the price of a typical seven-day cruise.  Another estimate put the additional costs higher, at $15 to $18 per passenger day.  Increased costs translate into decreased cruise ship visitors.  Clearly, enforcement of the ECA will have a significant and harmful effect on Alaska's citizens and economy.

## VII.   CLAIMS FOR RELIEF

### First Cause of Action

### (Violation of the Treaty Clause)

33.     The State repeats and re-alleges each allegation in Paragraphs 1 through 32.

34.     Article II, Section 2 of the Constitution provides that the President "shall have the Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur."  U.S. Const. art. II, § 2, cl. 2.  Under the Treaty Clause, a treaty cannot become binding domestic law in the U.S. unless two-thirds of the Senate give advice and consent to the treaty.  U.S. Const. art. II, § 2, cl. 2.

35.     Section 1909(b) of APPS purports to allow an amendment to Annex VI, creating an ECA, to become binding domestic law in the U.S. without the advice and consent of two-thirds of the Senate.  That provision is therefore unconstitutional.  The Secretary of State's acceptance of the ECA pursuant to that provision was also unconstitutional.

36.     Enforcement of the ECA in Alaska will irreparably injure the State and Alaska's citizens and economy.  The State has no other adequate means to redress the violations alleged in this Complaint.

## Second Cause of Action

### (Violation of the Separation of Powers Doctrine)

37.     The State repeats and re-alleges each allegation in Paragraphs 1 through 36.

38.     The Framers designed a system of separate powers "to implement a fundamental insight:  Concentration of power in the hands of a single branch is a threat to liberty."  *Clinton v. City of N.Y.*, 524 U.S. 417, 451 (1998) (Kennedy, J., concurring).  Under the Framers' separate powers system, Congress possesses the lawmaking

20

authority, while the executive branch possesses the authority to execute laws. A violation of the Separation of Powers Doctrine occurs when one branch invades the territory of another, even if both branches approve the encroachment. The supermajority requirement in Article II, Section 2, is one important legislative check on executive power under our system of government.

39.     APPS permits the Secretary of State, without the involvement of the Senate, to make a treaty amendment to Annex VI enforceable domestic law by taking appropriate action concerning that amendment, or by not rejecting that amendment. By this, Congress unconstitutionally yielded its lawmaking powers and the Senate's treaty-making role—and those of future Congresses—to the executive branch.

40.     Enforcement of the ECA in Alaska will irreparably injure the State and Alaska's citizens and economy. The State has no other adequate means to redress the violations alleged in this Complaint.

## VII.   RELIEF REQUESTED

Based on the foregoing, Alaska requests the following relief:

A.     Declare that the Secretary of State's acceptance of an ECA extending to Alaska was unconstitutional and set aside;

B.     Declare that 33 U.S.C. § 1909(b) is unconstitutional in that it violates the Treaty Clause and the Separation of Powers Doctrine;

C.     Based on all the violations alleged in the Complaint, preliminarily and permanently enjoin all Defendants from enforcing the ECA in the waters off the coast of Alaska;

21

D.    Award the State its costs in bringing this action, along with its

attorney's fees; and

E.    Grant the State such other and further relief as this Court

deems just and equitable.

Respectfully submitted this 16th day of July, 2012 by:

MICHAEL C. GERAGHTY
ATTORNEY GENERAL

By:    /s/ Seth M. Beausang
       Seth M. Beausang
       Alaska Bar No. 1111078
       Lauri J. Adams
       Alaska Bar No. 7907068
       Mary Ann Lundquist
       Alaska Bar No. 9012132
       Assistant Attorney Generals
       1031 W. 4th Avenue, Suite 200
       Anchorage, AK 99501
       Phone: (907) 269-5274
       Fax: (907) 278-7022
       **Attorneys for Plaintiff**