**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

STATE OF ALASKA et al.,

Plaintiffs,

v.

JOHN F. KERRY et al.,

Defendants.

Case No. 3:12-cv-00142-SLG

<u>**ORDER RE ALL PENDING MOTIONS**</u>

**INTRODUCTION**

The State of Alaska, later joined by the Resource Development Council for Alaska as a plaintiff-intervenor, initiated this action to challenge the federal enforcement of low-sulfur fuel requirements for marine vessels operating in certain Alaskan coastal waters.

The low-sulfur requirements were implemented pursuant to the United States' obligations as a party country to the International Convention for the Prevention of Pollution from Ships, known as MARPOL. Annex VI of MARPOL designates certain emission control areas ("ECAs") in which sulfur, nitrogen, and other vessel emissions are regulated more strictly than in other areas. In April 2009, the United States and Canada jointly proposed amending MARPOL to include a North American ECA, which includes the Southeast and Southcentral coasts of Alaska. The ECA amendment was adopted and became part of MARPOL in March 2010. The Secretary of State subsequently accepted the amendment for the United States on August 1, 2011.

One year later, on August 1, 2012, the Environmental Protection Agency ("EPA") and the U.S. Coast Guard began jointly enforcing low-sulfur vessel fuel requirements in the North American ECA. As of that date, marine vessels within the North American ECA were required to use fuel with a sulfur content that does not exceed 10,000 parts per million ("ppm"). Beginning in 2015, marine vessels within the North American ECA will be required to use fuel with a sulfur content that does not exceed 1,000 ppm.[1]

Currently pending before the Court are the State's Motion for Preliminary Injunction and two motions to dismiss filed by the Federal Defendants. For the reasons

---

[1] Docket 9 ("SAC") ¶ 1.

discussed below, the Court grants the motions to dismiss and denies the motion for preliminary injunctive relief.

## FACTUAL AND PROCEDURAL BACKGROUND

## I.   MARPOL.

MARPOL is a convention of the International Maritime Organization ("IMO"), a specialized United Nations agency.[2]  MARPOL was adopted in 1973 and amended in 1978.[3]  The convention's purpose is to reduce marine pollution by ships.[4]

MARPOL currently contains six annexes, each of which addresses a different type of marine pollution.[5]  Annex VI, the annex implicated in this litigation, addresses air pollution.[6]  It was adopted by the IMO in 1997.

Annex VI designates ECAs, a term which it defines as:

> an area where the adoption of special mandatory measures for emissions from ships is required to prevent, reduce and control air pollution from $NO_x$ or $SO_x$ and particulate matter or all three types of emissions and their attendant adverse impacts on human health and the environment. Emission control areas shall include those listed in, or designated under, regulations 13 and 14 of this Annex.[7]

Regulation 14 of Annex VI provides standards for sulfur oxides ($So_x$) emissions. It specifies that the sulfur content of fuel used on board ships in all areas shall not

---

[2] Until 1982, IMO was known as the Inter-Governmental Maritime Consultative Organization.

[3] Dockets 9-1, 9-2 (SAC Exs. A, B).

[4] Docket 9-1 (SAC Ex. A).

[5] Annex I addresses oil; Annex II, noxious liquid substances carried in bulk; Annex III, harmful substances carried in packaged form; Annex IV, sewage; and Annex V, garbage.

[6] Docket 9-3 at 1 (MARPOL Annex VI).

[7] Docket 9-3 at 3.

exceed "4.50% m/m prior to 1 January 2012," "3.50% m/m on and after 1 January 2012," and "0.50% m/m on and after 1 January 2020."[8]  More stringent requirements apply within the ECAs identified in Regulation 14.  In those areas, the sulfur content of fuel shall not exceed "1.50% m/m prior to 1 July 2010," "1.00% m/m on and after 1 July 2010," and "0.10% m/m on and after 1 January 2015."[9]

## II.    United States' Adoption and Implementation of MARPOL.

In 1980, MARPOL was approved by two-thirds of the Senate.  Later that same year, Congress passed the Act to Prevent Pollution from Ships ("APPS") to implement MARPOL.[10]  In April 2006, the Senate again approved MARPOL, including Annex VI. In 2008, Congress amended APPS to implement Annex VI.[11]  The North American ECA was added to Annex VI in 2010.[12]

## III.   Amendment of MARPOL to Include the North American ECA.

Appendix III to Annex VI was implemented by Congress in the 2008 amendments to APPS and sets forth criteria and procedures for designating ECAs.[13]  Appendix III states that an ECA "should be considered for adoption by the [IMO] if supported by a demonstrated need to prevent, reduce and control emissions of $NO_x$ or $SO_x$ and

---

[8] Docket 9-3 at 16 (Annex VI, Reg. 14(1)).

[9] Docket 9-3 at 17 (Annex VI, Reg. 14(4)).

[10] Docket 19 at 9 (citing 126 Cong. Rec. S9263-72 (daily ed. July 2, 1980)); 33 U.S.C. § 1901 et seq.

[11] SAC ¶ 20; Docket 19 at 9 (citing SAC Ex. C; 152 Cong. Rec. S3400 (daily ed. April 7, 2006); Pub. L. 110-280, 122 Stat. 2611 (2008)).

[12] SAC ¶¶ 20, 28.

[13] Docket 9-3 at 30 (Annex VI, Appendix III).

particulate matter . . . from ships."[14]  It outlines the process for adopting an ECA:  a party to MARPOL submits an ECA proposal; the IMO assesses the proposal, taking into account a specified set of criteria; if the proposal passes muster, it is adopted and brought into force by means of an amendment to Annex VI.[15]

MARPOL directs that a proposal for the designation of an ECA include the following:

- a description of the human populations and environmental areas at risk from the impacts of ship emissions;

- an assessment that emissions from ships operating in the proposed area of application are contributing to ambient concentrations of air pollution or to adverse environmental impacts.  Such assessment shall include a description of the impacts of the relevant emissions on human health and the environment, such as adverse impacts to terrestrial and aquatic ecosystems, areas of natural productivity, critical habitats, water quality, human health, and areas of cultural and scientific significance, if applicable.  The sources of relevant data including methodologies used shall be identified;

- relevant information, pertaining to the meteorological conditions in the proposed area of application, to the human populations and environmental areas at risk, in particular prevailing wind patterns, or to topographical, geological, oceanographic, morphological or other conditions that contribute to ambient concentrations of air pollution or adverse environmental impacts;

- the nature of the ship traffic in the proposed emission control area, including the patterns and density of such traffic;

- a description of the control measures taken by the proposing Party or Parties addressing land-based sources of $NO_x$, $SO_x$ and particulate matter emissions affecting the human population and environmental areas at risk that are in place and operating concurrent with the consideration of measures to be adopted in relation to provisions of regulations 13 and 14 of Annex VI; and

[14] Docket 9-3 at 30 (Annex VI, Appendix III(1)(1.3)).

[15] Docket 9-3 at 30 (Annex VI, Appendix III(2)-(4)).

- the relative costs of reducing emissions from ships when compared with land-based controls, and the economic impacts on shipping engaged in international trade.[16]

Appendix III also provides that "[t]he geographical limits of an emission control area will be based on the relevant criteria . . . including emissions and deposition from ships navigating in the proposed area, traffic patterns and density, and wind conditions."[17]

On April 2, 2009, the United States and Canada submitted a 74-page joint petition to the IMO to create the following North American ECA, which would include certain designated Alaskan coastal waters[18]:



The petition referenced a Technical Support Document ("TSD") that had been published by the EPA in April 2009.[19]

---

[16] Docket 9-3 at 30-31 (Annex VI, Appendix III(3.1)(2)(3)-(8)).

[17] Docket 9-3 at 31 (Annex VI, Appendix III(3.2)).

[18] The petition is available at http://www.epa.gov/nonroad/marine/ci/mepc-59-eca-proposal.pdf.

[19] The TSD is available at http://www.epa.gov/oms/regs/nonroad/marine/ci/420r09007.pdf.

Article 16 of MARPOL outlines the IMO's procedure for amending the convention.[20]  After being "adopted by a two-thirds majority of only the Parties to the Convention present and voting," the amendment is communicated to all parties to MARPOL and deemed accepted unless certain types of objections are made.[21]  Once the amendment has been accepted, it becomes effective six months later with respect to parties that have accepted it, but not with respect to parties that declared they did not accept it or those that declared their express approval was necessary.[22]

In March 2010, the IMO voted to amend Annex VI to designate the North American ECA.[23]  As a result, the ECAs listed in Regulation 14 of Annex VI now include "the North American area as described by the coordinates provided in appendix VII to this Annex."[24]  Appendix VII describes the North American ECA by a listed series of geographic coordinates, and, as noted above, it includes Southeast and Southcentral Alaskan coastal waters.[25]

The ECA amendment was circulated to all MARPOL parties for acceptance.  The United States Secretary of State did not reject the amendment, nor did any other party to MARPOL.  As a result, the North American ECA entered into force as a matter of

---

[20] Docket 9-1 at 12.

[21] Docket 9-1 at 12-13 (Article 16(2)).

[22] Docket 9-1 at 13-14 (Article 16(2)).

[23] SAC ¶ 28.

[24] Docket 9-3 at 16 (Annex VI, Reg. 14(3)(2)).

[25] Docket 9-3 at 36-43 (Annex VI, Appendix VII).

international law with respect to the United States and all other parties to MARPOL on August 1, 2011.[26]

## IV. EPA Action.

In January 2009, before the United States and Canada submitted their joint ECA petition to the IMO, EPA issued a Regulatory Update entitled "Frequently Asked Questions about the Emission Control Area Application Process" that expressed its intention to include the designated portion of Alaska in the North American ECA.[27] The Regulatory Update includes the following:

> **Will the coasts of Alaska and Hawaii (and other U.S. territories) be included in the application? If not, can they be included in the future?**
>
> Ideally, we would like to include all of the U.S. coasts in our application for ECA designation, including Alaska, Hawaii, and the U.S. territories. To do so, however, we will have to provide information that demonstrates a need for control, as specified in the criteria for ECA designation. This is challenging because, although our emissions modeling includes all 50 states, our air quality modeling does not extend beyond the 48 contiguous states. Therefore, it will be necessary to find other ways to measure the health and environmental impacts of marine emissions on health and human welfare outside the continental United States.
>
> We have not made a final determination on whether the coasts of Alaska and Hawaii will be included in the initial U.S./Canada ECA application. We are working with the Alaska DEC and Hawaii DOH to generate information that would better inform us of the health and environmental

---

[26] SAC ¶ 28; *cf. Pac. Merch. Shipping Ass'n v. Goldstene*, 639 F.3d 1154, 1160-61 (9th Cir. 2011) ("On March 27, 2009 . . . Canada and the United States jointly proposed, pursuant to the procedures established by the International Maritime Organization ("IMO"), that an Emissions Control Area ("ECA") be established under Annex VI of the International Convention for the Prevention of Pollution from Ships ("MARPOL"). The IMO, which is responsible for administering the treaty, evidently adopted the joint proposal on March 26, 2010 . . . . This action makes the ECA binding on all treaty signatories."), *cert. denied*, 133 S. Ct. 22 (2012).

[27] SAC ¶ 25; Docket 19 at 12. The Regulatory Update is available at http://www.epa.gov/nonroad/marine/ci/420f09001.pdf.

impacts that shipping may have in these states. We have not yet engaged other U.S. territories on this issue.

We intend to submit an application for ECA designation at the earliest possible date covering the areas for which we have the strongest case. If the case for controlling additional areas is compelling, such areas would be included in a future, supplemental application for ECA designations.[28]

On August 28, 2009, after the ECA petition had been submitted but before the IMO had voted to amend Annex VI, EPA published a Notice of Proposed Rulemaking ("NPRM") that included proposed rules to implement MARPOL's low-sulfur requirements in the proposed North American ECA, including Alaskan coastal waters.[29] During the one-month comment period, EPA received comments on the NPRM from sources including the Resource Development Council for Alaska, Alaska Governor Sean Parnell, and Alaska Senators Lisa Murkowski and Mark Begich.[30] In December 2009, EPA responded to the comments and published a Regulatory Impact Analysis.[31] On April 30, 2010, after Annex VI had been amended by the IMO but before the North American ECA went into force, EPA published its Final Rule ("Marine Diesel Rule") and indicated that the Rule adopted "emission standards . . . equivalent to those adopted in the amendments to Annex VI to . . . MARPOL," including the effective dates for when the new sulfur limits would become applicable in the North America ECA.[32]

---

[28] Regulatory Update at 5.

[29] SAC ¶ 30; Docket 19 at 16-17 (citing Control of Emissions from New Marine Compression-Ignition Engines at or Above 30 Liters per Cylinder, 74 Fed. Reg. 44442 (Aug. 28, 2009)).

[30] Docket 19 at 17-18 (citing SAC ¶ 31 and Exs. D, E, F).

[31] SAC ¶ 32; Docket 19 at 18, 20.

[32] Control of Emissions from New Marine Compression-Ignition Engines at or Above 30 Liters per Cylinder, Final Rule ("Marine Diesel Rule"), 75 Fed. Reg. 22896, 22896 (Apr. 30, 2010).

## V. Procedural History.

The State of Alaska filed its initial Complaint in this action on July 13, 2012, followed by an Amended Complaint on July 16, 2012, and a Second Amended Complaint ("SAC") on September 18, 2012.[33] The SAC names as Defendants the Secretary of State, EPA and its Administrator, the Department of Homeland Security and its Secretary, and the Coast Guard and its Commandant (collectively, "Federal Defendants"). The SAC asserts four claims for relief: (1) the Secretary of State's decision to accept the ECA amendment violated the Administrative Procedure Act ("APA") and APPS and should be set aside; (2) enforcement of the ECA amendment as domestic federal law violates the Treaty Clause and separation of powers; (3) EPA's Marine Diesel Rule violated the APA's notice-and-comment rulemaking requirements; and (4) applying the ECA to foreign-flagged ships exceeds EPA's authority under the APA and APPS.[34] The State has subsequently abandoned its third cause of action.[35] The SAC alleges that enforcement of the ECA in the waters off the coast of Alaska will raise costs for marine vessels and that those higher costs will cause economic harm to the State.[36] The SAC seeks declaratory relief as to the invalidity of the North American ECA, as well as an injunction preventing the Defendants from enforcing the ECA in Alaska.

---

[33] Dockets 1, 5, 9.

[34] SAC ¶¶ 44-61.

[35] Docket 79 at 41 ("[T]he State agrees that its third cause of action should be dismissed.").

[36] SAC ¶ 1.

The Resource Development Council for Alaska ("RDC") intervened as a Plaintiff and two groups of entities intervened as Defendants: the Center for Biological Diversity, Environmental Defense Fund, Friends of the Earth, and Natural Resources Defense Council (collectively, "Environmental Defendants") and the South Coast Air Quality Management District, Santa Barbara Air Pollution Control District, and Puget Sound Clean Air Agency (collectively, "Clean Air Defendants").[37]

RDC is a statewide nonprofit membership organization whose members include individuals and companies from Alaska's oil and gas, mining, forest products, tourism, and fisheries industries.[38] The Environmental Defendants are all nonprofit organizations devoted to protecting marine and coastal ecosystems and to preserving air quality for the health of coastal communities through participation in the administrative process, litigation, and public education.[39] The Clean Air Defendants are all clean air agencies charged with attaining health-based air quality standards in their respective localities, as required by the Clean Air Act.[40]

The State filed a Motion for Preliminary Injunction on September 28, 2012, which was subsequently supported by RDC and opposed by all Defendants.[41] The Federal

---

[37] Docket 55.

[38] Docket 60 ("Intervenor Compl.") ¶ 11.

[39] Docket 13 at 4-5.

[40] Docket 33 at 7-8.

[41] Dockets 15, 61, 41, 52, 57.

Defendants filed a Motion to Dismiss the Second Amended Complaint on November 9, 2012, which was opposed by the State.[42]

RDC filed its Intervenor Complaint on November 21, 2012. The Intervenor Complaint names all Defendants in this action, incorporates many of the facts alleged in the SAC by reference, and asserts three claims for relief that overlap with those asserted by the State in the SAC: (1) violation of the Treaty Clause, (2) violation of the nondelegation doctrine, and (3) violation of the separation of powers doctrine.[43] It seeks a declaration that the North American ECA designation violates the Constitution and an injunction preventing the EPA from enforcing the ECA in Alaska.[44] The Federal Defendants filed a Motion to Dismiss RDC's Intervenor Complaint on December 20, 2012, which was opposed by RDC.[45]

Briefing on all three motions concluded on March 12, 2013. Oral argument was not requested by any party and is not necessary to the Court's determination of the motions.

## DISCUSSION

The Court turns first to the Federal Defendants' Motions to Dismiss, which seek dismissal of the State's and RDC's Complaints. Both motions were filed pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and assert that this Court lacks

---

[42] Dockets 48, 77.

[43] Intervenor Compl. ¶¶ 32-41.

[44] Intervenor Compl. ¶¶ A-C.

[45] Dockets 70, 83.

subject matter jurisdiction over this action and that the State and RDC have each failed to state a claim upon which relief can be granted.[46]

## I. Dismissal Standard.

### A. Civil Rule 12(b)(1).

Federal Rule of Civil Procedure 12(b)(1) allows a party to seek dismissal of a complaint for lack of subject matter jurisdiction. "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."[47] When faced with a challenge to its subject matter jurisdiction under Rule 12(b)(1), a court must resolve that issue before determining whether a complaint states a cause of action under Rule 12(b)(6).[48]

"A federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears."[49] The party asserting jurisdiction bears the burden of establishing subject matter jurisdiction on a motion to dismiss under Rule 12(b)(1).[50]

Challenges to subject matter jurisdiction can take two forms, facial and factual, which the Ninth Circuit has explained as follows:

> In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the

---

[46] Dockets 48, 70.

[47] *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) (quoting Fed. R. Civ. P. 12(h)(3)).

[48] *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-94 (1998).

[49] *A-Z Int'l v. Phillips*, 323 F.3d 1141, 1145 (9th Cir. 2003) (quoting *Stevedoring Servs. of Am., Inc. v. Eggert,* 953 F.2d 552, 554 (9th Cir. 1992)).

[50] *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 984 (9th Cir. 2008) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *Stock W., Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221, 1225 (9th Cir. 1989)).

allegations that, by themselves, would otherwise invoke federal jurisdiction.[51]

Here, Defendants have presented factual challenges to the Court's subject matter jurisdiction over certain of the claims asserted. When ruling on a factual challenge to subject matter jurisdiction, the Court may consider material outside the pleadings.[52]

### B. Civil Rule 12(b)(6).

Federal Rule of Civil Procedure 12(b)(6) permits a party to seek dismissal of an action for failure to state a claim upon which relief can be granted. Under the "facial plausibility" pleading standard established by the Supreme Court in *Ashcroft v. Iqbal*, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"[53] For purposes of the Federal Defendants' 12(b)(6) arguments to dismiss the SAC and the Intervenor Complaint, the Court accepts as true the material factual allegations contained in the complaints and draws all reasonable inferences in the non-moving parties' favor.[54]

## II. SAC Claim 1: Violation of APPS and the APA.

After the IMO adopts an amendment to MARPOL, it is not effective as a matter of domestic law unless and until it is accepted by the United States. Section 1909 of APPS

---

[51] *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004) (quoting *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004)).

[52] *Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 778 (9th Cir. 2000) (quoting *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989)).

[53] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[54] *Rouse v. U.S. Dep't of State*, 567 F.3d 408, 411 (9th Cir. 2009) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)).

provides the process within the United States for accepting or rejecting amendments to

MARPOL:

(a) Acceptance of certain amendments by the President

A proposed amendment to the MARPOL Protocol received by the United States from the Secretary-General of the International Maritime Organization pursuant to Article VI of the MARPOL Protocol, may be accepted on behalf of the United States by the President following the advice and consent of the Senate, except as provided for in subsection (b) of this section.

(b) Action on certain amendments by Secretary of State

A proposed amendment to Annex I, II, V, or VI to the Convention, appendices to those Annexes, or Protocol I of the Convention, received by the United States from the Secretary-General of the Inter-Governmental Maritime Organization pursuant to Article VI of the MARPOL Protocol, may be the subject of appropriate action on behalf of the United States by the Secretary of State following consultation with the Secretary, or the Administrator as provided for in this chapter, who shall inform the Secretary of State as to what action he considers appropriate at least 30 days prior to the expiration of the period specified in Article VI of the MARPOL Protocol during which objection may be made to any amendment received.

(c) Declaration of nonacceptance by the Secretary of State

Following consultation with the Secretary, the Secretary of State may make a declaration that the United States does not accept an amendment proposed pursuant to Article VI of the MARPOL Protocol.[55]

The SAC's first cause of action asserts that the Secretary of State violated APPS

by failing to take "appropriate action" on the ECA amendment, as required by Section

1909(b), and that the Secretary of State's acceptance of the amendment violated the

APA because it "was arbitrary and capricious, an abuse of discretion, in excess of

---

[55] 33 U.S.C. § 1909.  The Secretary referred to in the phrase "consultation with the Secretary" in both subsections (b) and (c) is "the Secretary of the department in which the Coast Guard is operating." *See* 33 U.S.C. § 1901(a)(11).

statutory authority, and otherwise not in accordance with law."[56] Specifically, the State asserts that the Secretary of State's acceptance of the ECA was not an "appropriate action" because he must consider each of the Appendix III criteria before accepting an amendment to MARPOL, and certain of these criteria were not assessed for the Alaska portion of the ECA.

The Defendants assert that this claim merits dismissal under Civil Rule 12(b)(1) because the Court lacks subject matter jurisdiction to review this claim. They contend that "Alaska's first cause of action . . . is barred by the political question doctrine" and that the State "seeks review that is expressly precluded under the APA."[57]

### A. Political Question Doctrine.

The Ninth Circuit has held that the political question doctrine "is at bottom a jurisdictional limitation imposed on the courts by the Constitution."[58] Accordingly, as this issue implicates the Court's subject matter jurisdiction, the Court first considers the parties' arguments under Rule 12(b)(1).[59]

The Ninth Circuit explained in *Corrie v. Caterpillar*:

> The political question doctrine first found expression in Chief Justice Marshall's observation that "[q]uestions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170, 2 L.Ed. 60 (1803). The Supreme Court has since explained that "[t]he

---

[56] SAC ¶¶ 45-46.

[57] Docket 49 at 16. The Defendants also assert that even if the Secretary of State's action is subject to judicial review, the claim should be dismissed under Rule 12(b)(6) because the ECA amendment had a valid scientific basis and therefore complied with Appendix III.

[58] *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 981 (9th Cir. 2007).

[59] *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-94 (1998).

nonjusticiability of a political question is primarily a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 211, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).[60]

The conduct of foreign relations "is committed by the Constitution to the executive and legislative [branches] . . . and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision."[61] "However, it is 'error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.'"[62] And, a court "will not find a political question 'merely because [a] decision may have significant political overtones.'"[63] Rather, a court must "undertake a discriminating case-by-case analysis to determine whether the question posed lies beyond judicial cognizance."[64]

In *Baker v. Carr*, the plaintiffs sought a declaration that a state apportionment statute was an unconstitutional deprivation of equal protection. The district court had found the claim nonjusticiable under the political question doctrine. The Supreme Court, after conducting an extensive review of prior case law on the subject, held that six factors should be considered in evaluating whether the political question doctrine bars suit:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding

---

[60] *Corrie*, 503 F.3d at 980.

[61] *Id.* at 982 (quoting *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918)).

[62] *Id.* (quoting *Baker v. Carr,* 369 U.S. 186, 211 (1962)).

[63] *Id.* (quoting *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986)).

[64] *Id.* (quoting *Alperin v. Vatican Bank*, 410 F.3d 532, 545 (9th Cir. 2005)).

without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

. . . Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence.[65]

In *Baker*, the Supreme Court ultimately concluded that the plaintiffs' claim was justiciable. And yet since then, *Baker* has been the dominant authority on the political question doctrine.

Under *Baker,* if any one of its six factors is "inextricable from the case at bar," then dismissal of the action is warranted. Three of the factors are at issue here: the second, fourth, and sixth *Baker* factors.

    *i.*   Baker *Factor Two: Lack of Judicially Discoverable and Manageable Standards.*

The Federal Defendants assert that Sections 1909(b) and (c) of APPS "do not include judicially manageable standards for reviewing the Secretary of State's decisions."[66] As cited above, 33 U.S.C. § 1909(b) and (c) provide that the Secretary of State "may" take "appropriate action" on an amendment to a MARPOL Annex, or reject the amendment.

---

[65] *Baker*, 369 U.S. at 217.

[66] Docket 49 at 31.

*(a) Relevance of Appendix III Criteria.*

The State asserts that if the Court adopts its interpretation of APPS, "then there is plenty of law to apply" because "the Court can assess whether the ECA proposal that the Secretary of State accepted complied with the very specific requirements of MARPOL and Appendix III."[67]  In this way, the State asserts, "Congress ensured that only ECA amendments that comply with Appendix III would be accepted, for it cannot be 'appropriate action' to accept an amendment that does not comply with the terms of the treaty."[68]  Specifically, the State maintains that the Secretary of State improperly accepted the inclusion of Alaska in the North American ECA because the amendment "did not contain the environmental assessment or meteorological information required by Appendix III."[69]

The State cites to legislative history indicating the Senate expected that the "United States may seek the establishment of one or more [ECAs] in the United States pursuant to the procedures set out in Appendix III to Annex VI."[70]  It asserts the cited sources "show that the Senate approved Annex VI with the understanding that the executive branch would comply with Appendix III when seeking to establish an ECA for the United States."[71]  The State argues that "[i]t is only by interpreting 'appropriate action' to mean, in the context of a proposed ECA, a duty to ensure compliance with

---

[67] Docket 79 at 11.

[68] Docket 19 at 24.

[69] Docket 19 at 24.

[70] Docket 19 at 25 (citing S. Exec. Rep. No. 109-13, at 4 (2006)).

[71] Docket 19 at 26.

Appendix III, that effect can be given to the Senate's intention that ECAs be designated consistent with Appendix III."[72]

The State also relies on the D.C. Circuit's decision in *Defenders of Wildlife, Inc. v. Endangered Species Scientific Authority.*[73] That case involved an international convention that identified a number of endangered species, including bobcats, and limited international trade of the species. The convention, however, did not specify a quota for each participating nation. Rather, it was incumbent on each participating nation to develop its own export quotas. The convention specified that each nation was to establish a Scientific Authority to determine and monitor the number of export permits to be granted by that nation, and a Management Authority to ensure compliance.

Congress implemented the convention through the Endangered Species Act of 1973 ("ESA"). The ESA directed the President to establish the two authorities which "shall do all things necessary and appropriate to carry out the functions of the [authorities] under the Convention."[74] The Secretary of the Interior was designated as both the Management and Scientific Authority.[75] The Scientific Authority published findings regarding bobcats and established export quotas based on those findings. The plaintiffs challenged the export quotas, asserting the convention had not been implemented by Congress, and the Scientific Authority's actions were not in conformance with the convention. The federal defendants argued there was "no

---

[72] Docket 19 at 26.

[73] Docket 19 at 27 (citing *Defenders*, 659 F.2d 168 (D.C. Cir. 1981)); Docket 79 at 13 (same).

[74] *Defenders*, 659 F.2d at 174.

[75] *Id.* at 172 n.2.

meaningful basis" for reviewing the agency actions "because the Convention provide[d] merely generalized standards . . . and Congress ha[d] neither implemented the substance of nor particularized those standards."[76]

The D.C. Circuit held the case was justiciable. It determined that Congress had implemented the convention. And it cited the ESA's directive that the Secretary of the Interior "shall do all things necessary and appropriate" to carry out the functions of the Scientific Authority and Management Authority under the convention. As a result, "the Convention [was] 'a source of rights enforceable by an individual litigant in a domestic court of law'" pursuant to Administrative Procedure Act,[77] which directs a court to set aside agency action that is "arbitrary and capricious and not in accordance with law."[78]

Citing *Defenders*, the State asks this Court to "find that the Secretary of State's duty under APPS to take 'appropriate action' makes Appendix III a source of enforceable rights" and to "set aside the Secretary of State's acceptance of the ECA . . . because the ECA proposal did not comply with Appendix III."[79] However, the agency action in *Defenders* differs significantly from that here in two ways. First, in *Defenders* the plaintiffs challenged actions that the agency had undertaken specifically to effectuate the international convention, and they asked the court to evaluate whether those actions satisfied the United States' obligations under the convention. The

---

[76] *Id.* at 175.

[77] *Id.* at 174-75 (quoting *People of Saipan v. U.S. Dep't of Interior*, 502 F.2d 90, 97 (9th Cir. 1974)).

[78] Administrative Procedure Act § 706(2)(A), 5 U.S.C. § 706(2)(A) (2012).

[79] Docket 19 at 27-28.

convention itself did not specify the quotas, only the methodology to use to determine those quotas.   In contrast, here Plaintiffs challenge the federal government's acceptance of an international amendment to MARPOL that specifies the precise area of the ECA, and they ask the Court to determine whether that international amendment is consistent with the convention's terms.   Second, the implementing statute in *Defenders* explicitly established the convention as the relevant source of authority when it directed that the Secretary of State "shall do all things necessary and appropriate to carry out" the convention's functions.   By contrast, here APPS simply provides that a MARPOL Annex amendment "may be the subject of appropriate action" by the Secretary of State.   APPS does not mandate any particular action by the Secretary of State, or define "appropriate action" as action necessary to fulfill obligations under the convention, as was explicitly done in *Defenders*.[80]

*Defenders* holds that a court may review agency actions, undertaken pursuant to implementing legislation that specifically mandates the agency's compliance with an international agreement, to ensure that those actions are consistent with the implementing law that incorporates the international agreement.   This Court does not read *Defenders* as holding that a court may or should review an agency action that simply accepts an amendment to an international agreement to ensure that the amendment is consistent with other provisions of the international agreement.[81]   Thus,

---

[80] *Cf.* 33 U.S.C. § 1903(c)(1) ("The Secretary shall prescribe any necessary or desired regulations to carry out the provisions [of MARPOL].").

[81] *Cf.* Docket 41 at 12 (Clean Air Defendants' Opp. to Mot. for Injunctive Relief) ("There is no indication that Congress intended the Secretary to second-guess the evidence supporting a proposal submitted *by the United States itself* and duly approved by the authorized agency, the International Maritime Organization.").

*Defenders* does not resolve the question of whether the political question doctrine bars review of this claim.

The State also asserts that the Ninth Circuit's decision in *Hopson v. Kreps* involved a similar question.[82] *Hopson* involved regulations the U.S. Department of Commerce ("DOC") had adopted pursuant to the International Whaling Convention Act of 1949, which Congress had enacted to implement the International Whaling Convention ("IWC").[83] The IWC created an international commission to establish whaling regulations and amend them as necessary. In 1977, the commission amended its regulations to eliminate an exception that had existed for native subsistence whale hunting. Had the United States lodged a formal objection to the amendment within 90 days, the amendment would have been inapplicable to the United States. But the United States did not object, and the DOC subsequently implemented the amended regulations. The plaintiff in *Hopson* brought suit, arguing that because the DOC's authority to implement the regulations came from the IWC (via implementation by the 1949 Act), and because the regulations at issue exceeded the jurisdiction of the commission, the DOC lacked the statutory authority to implement the regulations. Specifically, the plaintiff asserted that the commission exceeded its jurisdiction because the IWC was applicable only to commercial whaling vessels and not to the small boats used by Eskimos.

The *Hopson* court defined the "particular question posed" as "whether the Commerce Department exceeded limits on its statutory authority in promulgating [the]

---

[82] Docket 79 at 21 (citing *Hopson*, 622 F.2d 1375 (9th Cir. 1980)).

[83] *Hopson*, 622 F.2d at 1376-77.

regulations."[84]  The government argued that the suit was barred by the political question doctrine, but the Ninth Circuit found its arguments unpersuasive.  It explained that under Ninth Circuit precedent, claims that "went to the very existence of the power of the executive to act as it did" had been considered justiciable.[85]  The *Hopson* court held that "the criteria enunciated [in *Baker v. Carr*] generally do not apply to claims that the executive has exceeded specific limitations on delegated authority."[86]  The court determined that the claims in *Hopson* were not barred by the political question doctrine, even though the evaluation of the plaintiffs' claim would require the interpretation of the international convention.  Such interpretation was necessary in order to determine if the agency had exceeded the statutory authority conferred upon it by the legislation that had implemented the international convention.

Here, by contrast, Plaintiffs are not challenging  the Secretary of State's authority to accept MARPOL Annex amendments.[87]  MARPOL clearly provides for the designation of ECAs by amendment to Annex VI and APPS clearly allows the Secretary of State to accept such amendments.  Rather, Plaintiffs challenge the *manner* in which the Secretary of State's authority was exercised and propose standards by which it should be judged.

---

[84] *Id.* at 1379.

[85] *Id.* (citing *United States v. Decker*, 600 F.2d 733, 737 (9th Cir. 1979)).

[86] *Id.* at 1378 (citing *Baker v. Carr*, 369 U.S. 186, 217 (1962)).

[87] The State and RDC do dispute the constitutionality of APPS's delegation of authority, but that implicates different causes of action which are discussed separately *infra*.

The Ninth Circuit was careful to identify *Hopson* as an exception to *Baker*, and explained that it was looking to the IWC only to ascertain whether the DOC had been authorized to implement the regulations. The court wrote that "although '(i)t is the role of the judiciary to interpret international treaties and to enforce domestic rights arising from them,' treaties are relevant to the interpretation of congressional enactments *only to the extent that Congress makes them relevant.*"[88] The Ninth Circuit stressed that if the treaty is not self-executing, "it is not the treaty but the implementing legislation that is effectively 'law of the land.'"[89] Thus, *Hopson* does not support the State's argument that in providing that the Secretary of State "may take appropriate action," APPS incorporated by reference the MARPOL Appendix III criteria.

Accordingly, the Court finds that APPS's authorization to the Secretary that he "may" take "appropriate action" does not require the Secretary of State to independently apply the criteria of Appendix III. As a result, Appendix III does not provide "judicially discoverable and manageable standards" for the Court to apply in evaluating the Secretary of State's action.

### (b) Meaning of "Appropriate Action."

The State next argues that even if "appropriate action" does not refer to the Appendix III criteria, the Court must—as a matter of statutory construction—attribute some meaning to Section 1909(b)'s "appropriate action" language in order to avoid

---

[88] *Hopson*, 622 F.2d at 1380 (emphasis added) (internal citation omitted) (quoting *Decker*, 600 F.2d at 737).

[89] *Id.* (emphasis added) (quoting L. Henkin, Foreign Affairs and the Constitution 159 (1972)).

rendering that language superfluous.[90]  The State contrasts subsection (b) with subsection (c), which allows the Secretary of State to "make a declaration that the United States does not accept an amendment."  The State maintains that in subsection (c), Congress clearly intended to accord the Secretary of State unfettered discretion to reject amendments. The State asserts that if Congress had intended the Secretary to have similarly unfettered discretion to accept amendments, it would have used similarly straightforward language in Section 1909(b).  Instead, the State asserts that because Congress used term "appropriate action" in Section 1909(b), that term must have a more restrictive meaning.

The State cites to the Supreme Court's decision in *Zivotofsky ex rel. Zivotofsky v. Clinton* as authority for its assertion that this question of statutory interpretation is not barred by the political question doctrine.[91]  That case concerned a statute that allowed Americans born in Jerusalem to choose to have "Israel" listed as their place of birth on their passports.  The State Department refused to follow the law based on its "longstanding policy of not taking a position on the political status of Jerusalem."[92]  Zivotofsky brought suit against the Secretary of State challenging the agency's refusal to put "Israel" on his passport.  The district and circuit courts "ruled that this case involves a political question because deciding Zivotofsky's claim would force the Judicial Branch to interfere with the President's exercise of constitutional power committed to

---

[90] Docket 79 at 15-16.

[91] Docket 79 at 17 (citing *Zivotofsky*, 132 S. Ct. 1421 (2012)); *cf.* Docket 52 at 31 (citing *Zivotofsky* in passing for another purpose).

[92] *Zivotofsky*, 132 S.Ct. at 1424.

him alone."[93]  The Supreme Court reversed, explaining that "[t]he federal courts are not being asked to supplant a foreign policy decision of the political branches with the courts' own unmoored determination of what United States policy toward Jerusalem should be," but rather were being asked to "enforce a specific statutory right."  The Court added that the lower courts had misconstrued the issue as implicating the second *Baker* factor.  Instead, the Court characterized the case as presenting a question regarding the constitutionality of the statutory provision at issue, thus involving "familiar principles of constitutional interpretation."[94]  *Zivotofsky* involved a private individual's statutory right, and thus it presents no clear parallels or precedent helpful to this case.

The State also asserts that the Ninth Circuit's decision in *Center for Policy Analysis on Trade and Health ("CPATH") v. Office of U.S. Trade Representative*, "makes it clear that determining whether a particular statute provides justiciable standards requires a close examination of the statute's language, legislative history, and other indicia of legislative intent."[95]  However, the legislative history of APPS gives no indication that Congress intended "appropriate action" to have a specific meaning. Given this silence, the Court finds the most likely meaning of "appropriate action" to be the one posited by the Environmental Defendants: that "appropriate action" simply "entails taking the steps necessary according to the treaty amendment procedures of MARPOL—either explicit acceptance or tacit acceptance—to communicate the United

---

[93] *Id.* at 1427.

[94] *Id.* at 1427-30.

[95] Docket 79 at 19 (citing *CPATH*, 540 F.3d 940, 946 (9th Cir. 2008)).

States' acceptance of an amendment."[96]   This does not, however, provide "judicially discoverable and manageable standards" for resolving the SAC's first claim.[97]

Accordingly, the second *Baker* factor supports the Defendants' assertion that the SAC's first cause of action is nonjusticiable.

   ii.   Baker *Factor Four: Impossibility to Review Without Expressing Lack of Respect.*

The Federal Defendants assert that "judicial evaluation of the Secretary's decision would express a lack of respect due Congress and the Executive" because it "would interfere with the statutory accommodation established by the political branches in section 1909 for the United States' acceptance or rejection of amendments to certain annexes to MARPOL."[98]

The State asserts that "courts routinely adjudicate statutory claims."[99]   However, as discussed above in the context of the second *Baker* factor, this claim does not require statutory interpretation, as APPS does not provide any standards for reviewing the Secretary of State's decision.   The State also asserts that declining to review this claim would require holding "that Congress was powerless to limit the Secretary of State's discretion to accept amendments to MARPOL," which would "presumptively

---

[96] Docket 57 at 19.

[97] As the Supreme Court has noted, "[i]t is difficult to draw any meaningful guidance from [the Clean Water Act's] use of the word 'appropriate,' which means only 'specifically suitable: fit, proper.' Webster's Third International Dictionary." *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 683 (1983).   The Court also cited with approval to a Circuit Judge who had noted "the absence of any clue as to the meaning of 'appropriate,'" and that "there is no comprehensible or principled meaning for 'appropriate.'"   *Id.* at 683 n.2 (quoting *Ala. Power Co. v. Gorsuch*, 672 F.2d 1, 24, 32 (D.C. Cir. 1982)).

[98] Docket 93 at 12, 18-19.

[99] Docket 79 at 20.

favor the Executive Branch at the expense of the Legislative Branch in violation of the separation of powers doctrine."[100]

The Federal Defendants respond that here, Congress chose not to place statutory limits on the Secretary of State's discretion.[101] They point out that when Congress amended the approval authority granted in 33 U.S.C. § 1909(b) to include the amendments to Annex VI, the Secretary of State had already acted on several other amendments pursuant to the authority granted by Section 1909(b) and that "the Senate was well aware that the United States was considering the designation of one or more ECAs along the coasts of the United States." They assert that "[g]iven the statutory accommodation reached between Congress and the Executive, which preserved the Secretary's wide discretion, this Court could not inject itself into that process without unduly impinging on those other branches of government." The Federal Defendants maintain that "barring review here under the political question [doctrine] would not favor the Executive over Congress. Rather, it would show *both* political branches the respect they are due."[102]

The Court finds that the language of APPS and the legislative history of Section 1909 clearly indicate that Congress intended to place decisions on MARPOL Annex amendments within the Secretary of State's discretion. Accordingly, judicial review of the Secretary of State's decision to accept the North American ECA would demonstrate

---

[100] Docket 79 at 20.

[101] Docket 93 at 19.

[102] Docket 93 at 19.

a lack of respect for both Congress's intent and the Secretary of State's executive powers.

   iii.   Baker *Factor Six:   Potentiality of Embarrassment from Multifarious Pronouncements.*

The Clean Air Defendants assert that a judicial action overturning the Secretary of State's acceptance of the ECA proposal that was submitted by the United States "clearly presents the 'potentiality of embarrassment from multifarious pronouncements by various departments on one question,' which typifies a political question."[103]   In making this argument, the Clean Air Defendants cite the D.C. Circuit's decision in *Adams v. Vance.*[104]   In *Adams*, the Secretary of State had determined not to object to an International Whaling Commission ban on Eskimo hunting of bowhead whales.   This decision was challenged in the district court, which issued an injunction ordering the Secretary of State to object.   The D.C. Circuit overturned the district court's order because it was "based on the unwarranted assumption that such objection would not harm the United States."[105]   Although the D.C. Circuit found it unnecessary to decide if the suit presented a nonjusticiable political question, it did hold that the district court's order was "an unwarranted intrusion on executive discretion in the field of foreign policy and agreements."[106]   In reaching this decision, the D.C. Circuit "accorded great

---

[103] Docket 41 at 14 (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962); *Made in the U.S.A. Found. v. United States,* 242 F.3d 1300, 1318 (11th Cir. 2001)).

[104] Docket 41 at 13 (citing *Adams*, 570 F.2d 950 (D.C. Cir. 1978)).

[105] *Adams*, 570 F.2d at 952.

[106] *Id.*

deference" to the affidavit testimony of the Assistant Secretary of State for Oceans and International Environmental and Scientific Affairs, which stated:

> If the United States now refuses to do what it has asked of others and objects to a restraint recommended by the Scientific Committee of the International Whaling Commission despite an early opportunity for review, this government's credibility and leadership in international whale conservation would be severely compromised. Foreign governments would regard this U.S. objection to the very first amendment which affects a U.S. domestic interest as evidence of U.S. hypocrisy on whale conservation. Other governments would be less likely to credit U.S. determination to act forcefully on future issues of whale conservation. The weakening of U.S. leadership in this field would make it much more difficult for the United States to achieve its long term objectives for international cooperation in respect to conservation of whales. It is possible that an objection by the United States at this time could lead to a cycle of objections by others which would damage the effectiveness of the established quota system.[107]

The record in this case contains the Declaration of David A. Balton, the Deputy Assistant Secretary for Oceans and Fisheries in the Bureau of Oceans and International Environmental and Scientific Affairs at the Department of State. Mr. Balton's testimony expresses concerns remarkably similar to those expressed by the Assistant Secretary in *Adams*.[108] Mr. Balton has extensive experience with marine conservation in the international context.[109] His Declaration states, in relevant part:

> The United States has a very significant and ongoing foreign policy and national security interest in demonstrating to other nations that our nation complies with its legal obligations under treaties and other binding international instruments. . . . Additionally, in the MARPOL context itself, a perception that the United States has not met its obligations would give rise to concern by other parties, including close friends and allies, that the

---

[107] *Id.* at 956 n.13.

[108] Docket 52-3 (Ex. C to U.S. Opp. Br.).

[109] Docket 52-3 at 1, ¶¶ 1-2.

United States may similarly renege on obligations stemming from other amendments to MARPOL Annexes.

The foreign policy consequences from the perception that the United States has failed to meet its obligations with respect to the North America ECA are particularly acute because that ECA was initiated, promoted, pursued, and adopted at the urging of the United States.  If we are seen as failing to implement the terms of our own initiative, it would seriously compromise the credibility and leadership role of the United States among other parties to MARPOL, among other IMO members and, more broadly, in our efforts to promote international norms to reduce marine pollution.  We would expect close allies like Canada and France, who had partnered with the United States in promoting this ECA, to view our conduct as undermining an important joint initiative, which was intended to reduce pollution affecting not only U.S. interests but also Canadian and French ones.  Other countries that supported the United States' proposal for a North American ECA would likely view the United States' non-implementation negatively and question whether and how closely to support similar initiatives by the United States in the future.  Finally, if the United States, as a central country in the North American ECA, were perceived as not implementing its obligations with respect to this ECA, it could weaken the incentives for other parties to abide by their obligations relating to the ECA and undermine the efficacy of the ECA and MARPOL more generally.  A weakening of this longstanding and carefully crafted international legal framework to combat marine pollution would directly harm the interests of the United States in protecting our waters and coastline and the well-being of the many people and industries in the United States that depend on them.[110]

The Court finds that Mr. Balton's Declaration provides persuasive evidence that the sixth *Baker* factor is implicated here.[111]  An order by this Court invalidating the North American ECA that the United States itself had proposed to MARPOL jointly with Canada would likely present a "potentiality of embarrassment from multifarious pronouncements" by the United States government to the international community.

---

[110] Docket 52-3 at 3, ¶¶ 7-8.

[111] *Cf.* Docket 41 at 13-14 (Clean Air Defs.) ("It must be remembered that the ECA involves the interests of Canada as well as the United States.  An order invalidating the Secretary's acceptance would implicate foreign policy and foreign commerce considerations that raise a political question.").

The Court has determined that three *Baker* factors are inextricable from the SAC's first cause of action. As a finding that even one factor is inextricable renders a claim a nonjusticiable political question, the Court finds that the SAC's first claim is not subject to judicial review. That claim is therefore dismissed.

### B. Agency Discretion.

Even if the political question doctrine did not bar review of the SAC's first claim, the Federal Defendants assert that a provision in the Administrative Procedure Act also renders the claim unreviewable.[112] The APA contains a basic presumption of reviewability of agency action.[113] However, 5 U.S.C. § 701(a)(2) provides that the APA does not apply "to the extent that . . . agency action is committed to agency discretion by law." This is "a very narrow exception" that applies in limited circumstances.[114] The Federal Defendants argue the exception applies here because (1) there is no law to apply in evaluating the Secretary of State's decision, and (2) the decision is unreviewable because it requires a complicated balancing of factors in the realm of foreign affairs, which is within the Secretary of State's particular expertise.[115]

### i. *No Law to Apply*.

In *Heckler v. Chaney*, the Supreme Court analyzed the APA's language, acknowledging the apparent contradiction of barring review of "action committed to

---

[112] Docket 52 at 38 (citing 5 U.S.C. § 701(a)(2)); Docket 93 at 22 (same).

[113] *Lincoln v. Vigil*, 508 U.S. 182, 190 (1993).

[114] *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

[115] Docket 52 at 38. The Clean Air Defendants also briefly addressed the first argument. Docket 41 at 14-15.

agency discretion" and adopting "abuse of discretion" as the standard for reviewable agency action.[116]  The Supreme Court reconciled this contradiction as follows:

> [E]ven where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.  In such a case, the statute ("law") can be taken to have "committed" the decisionmaking to the agency's judgment absolutely.  This construction avoids conflict with the "abuse of discretion" standard of review in § 706—if no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for "abuse of discretion."[117]

As this exception depends on the existence of "judicially manageable standards," it overlaps significantly with the second *Baker* factor.  The Court discussed this factor above and determined that APPS does not provide judicially manageable standards by which to review the Secretary of State's decision to accept the ECA amendment.[118] Certain of the parties' arguments are more relevant to the specific issue of the Secretary of State's discretion, however, so the Court addresses them here.

The Federal Defendants maintain that APPS's use of the permissive word "may" indicates Congress' recognition of "the Secretary of State's broad discretion to make decisions on the proposed amendments to MARPOL."[119]  The Federal Defendants maintain that the provisions of 33 U.S.C. § 1909(b) and (c) "do not dictate the circumstances under which the Secretary of State would take a particular action" and "are silent about why the Secretary of State might take action, what factors the

---

[116] 470 U.S. 821, 829 (1985).

[117] *Id.* at 830.

[118] *See supra* at 18-28.

[119] Docket 49 at 31.

Secretary of State would consider in deciding whether to take action, and other circumstances under which the Secretary of State would take action on the proposed amendments."[120] The Federal Defendants assert that this silence on what criteria the Secretary of State might consider, and the statute's failure even to specify what action might be taken, clearly leaves the decision "to the Secretary of State's discretion."[121]

The Supreme Court has held that, as a principle of statutory construction, "[t]he word 'may,' when used in a statute, usually implies some degree of discretion."[122] For example, in *Hinck v. United States*, the Supreme Court discussed a section of the Internal Revenue Code that provided the Secretary of the Treasury "may abate the assessment of all or any part" of interest that had accrued on unpaid federal income tax.[123] In interpreting that provision, the Court noted that "the federal courts uniformly held that the Secretary's decision not to grant an abatement was not subject to judicial review."[124] The Court approvingly remarked that those decisions "recognized that [the provision] gave the Secretary complete discretion to determine whether to abate interest, 'neither indicat[ing] that such authority should be used universally nor providing any basis for distinguishing between the instances in which abatement should and

_____

[120] Docket 49 at 32.

[121] Docket 49 at 32.

[122] *United States v. Rodgers*, 461 U.S. 677, 706 (1983); *cf. Martin v. Franklin Capital Corp.*, 546 U.S. 132, 136 (2005) (in the context of court-awarded attorney's fees, explaining that "[t]he word 'may' clearly connotes discretion" (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 533 (1994))).

[123] 550 U.S. 501, 503 (2007) (quoting 26 U.S.C. § 6404(e)(1) (1994 ed.)).

[124] *Id.*

should not be granted.'"[125]  Accordingly, "[a]ny decision by the Secretary [whether to abate] was . . . 'committed to agency discretion by law' under the Administrative Procedure Act and thereby insulated from judicial review."[126]

In *Southern Railway Co. v. Seaboard Allied Milling Corp.*, the Supreme Court considered a statute that provided the agency "*may*, upon the complaint of an interested party or upon its own initiative, order a hearing."[127]  The Court held that the agency's decision whether to order a hearing was unreviewable.  The Court explained, "[a]lthough we will not lightly interpret a statute to confer unreviewable power on an administrative agency, we have no choice in this case [because] 'there is persuasive reason to believe that [nonreviewability] was the purpose of Congress.'"[128]  In reaching this decision, the Court considered the statute's language, which was "silent on what factors should guide the Commission's decision," and found that that "on the face of the statute there is simply 'no law to apply' in determining if the decision is correct."[129]  The Court also analyzed the structure of the relevant act, which used mandatory language ("shall") in other provisions, and the act's legislative history, which indicated the relevant statute "was designed to avoid [the] disruptive consequences of judicial interference."[130]

---

[125] *Id.* at 504 (quoting *Selman v. United States*, 941 F.2d 1060, 1063 (10th Cir. 1991)).

[126] *Id.* (internal citation omitted).

[127] 442 U.S. 444, 455 (1979) (quoting 49 U.S.C. § 15(8)(a)).

[128] *Id.* at 454 (internal citations omitted) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967), *abrogated by Califano v. Sanders*, 430 U.S. 99 (1977)).

[129] *Id.* at 455-56.

[130] *Id.* at 456-60.

The State attempts to distinguish the cases cited by the Federal Defendants, asserting that many of them "involve agencies acting in an enforcement capacity and say nothing about the reviewability of the Secretary of State's decision to accept the ECA amendment."[131] The State specifically addresses *Hinck*, asserting it is inapposite for two reasons: (1) because here, Appendix III of Annex VI provides "readily available" standards for assessing the Secretary of State's decision, and (2) because *Hinck* "involved an executive officer acting in a law enforcement capacity, where decisions are traditionally not subject to judicial review."[132] The Court has already addressed and found unpersuasive the State's first point.[133] The State cites the following language from a different case, *Heckler v. Chaney,* to support the second point: "This Court has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."[134] *Heckler* was a case that addressed an agency's discretion to refuse to initiate enforcement proceedings.[135] But neither *Hinck* nor the instant case is a case challenging an agency decision not to prosecute. Rather, of significance to this case, the Court in *Hinck* held that after Congress added

---

[131] Docket 79 at 29. Notably, in its briefing on the political question doctrine, the State cites to enforcement cases as controlling precedent to support its argument that APPS imports the Appendix III criteria.

[132] Docket 79 at 29.

[133] *See supra* at 18-28.

[134] Docket 79 at 29 (citing *Heckler*, 470 U.S. 821, 831 (1985)).

[135] *Heckler*, 470 U.S. at 831.

an abuse of discretion standard to the statute, a disgruntled taxpayer was accorded a right to judicial review of a refusal to abate.[136]

The State also argues that APPS's use of "may" only gives the Secretary of State discretion to choose between 33 U.S.C. § 1909 (b) or (c), not to determine how to proceed within (b).[137] The State asserts that "[t]o accept the United States' argument that the Secretary of State has discretion when acting under § 1909(b) would mean that under that section [the Secretary] can take *inappropriate action* on an amendment to MARPOL, which is an absurd reading of the statute that the Court should reject."[138] The argument is not without some merit. But in the Court's view, the statutory language as drafted does not accord a litigant the right to challenge the appropriateness of the Secretary's decision. Stated differently, the statute accords the agency, and not a court, the discretion to determine what action is appropriate with respect to a MARPOL amendment under Annex VI.

The Supreme Court has qualified the general construction of "may" as implying discretion, holding that this principle "can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute."[139] As discussed extensively in this section and in the context of the second *Baker* factor above, the language of Section 1909(b) and its failure to constrain or guide

---

[136] *Hinck v. United States*, 550 U.S. 501, 504, 507 (2007) ("It is true that by providing an abuse-of-discretion standard, Congress removed one of the obstacles courts had held foreclosed judicial review of [abatement] determinations.").

[137] Docket 79 at 27.

[138] Docket 79 at 27-28 (emphasis in original).

[139] *United States v. Rodgers*, 461 U.S. 677, 706 (1983).

the Secretary of State's action indicates that Congress intended to place the acceptance of a MARPOL Annex amendment soundly within the Secretary of State's discretion. In contrast, other sections of APPS use mandatory rather than permissive language and specify factors the agency should consider when taking action.[140] Finally, the committee report containing the section-by-section analysis of APPS, which is discussed more extensively below,[141] states that Section 1909 "provides for consultation" by the Secretary of State regarding "what action should be taken" with respect to proposed amendments, and it states that the Secretary of State "is empowered" to declare the United States' non-acceptance of MARPOL Annex amendments. While the report does not specifically state that the Secretary of State is similarly empowered to accept amendments, it indicates that the purpose of Section 1909(b) was to create a "rapid amendment process" for MARPOL Annexes.[142] Thus, although the report does not explicitly commit acceptance of amendments to the Secretary of State's discretion, when read as a whole, it more strongly supports that interpretation than the one the State presents.

---

[140] *E.g.,* 33 U.S.C. § 1908(b) ("In determining the amount of the penalty, the Secretary, or the Administrator as provided for in this chapter, shall take into account the nature, circumstances, extent, and gravity of the prohibited acts committed and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and other matters as justice may require."); *cf. S. Ry. Co. v. Seaboard Allied Milling Corp.,* 442 U.S. 444, 456 (1979) ("Congress did not use permissive language such as that found in § 15(8)(a) when it wished to create reviewable duties under the Act. Instead, it used *mandatory language,* and it *typically included standards* to guide both the Commission in exercising its authority and the courts in reviewing that exercise." (emphasis added)).

[141] *See infra* at 46-48.

[142] H.R. Rep. No. 96-1224, at 18 (1980), reprinted in 1980 U.S.C.C.A.N. 4849, 4864.

Based on the foregoing, the Court finds that Section 1909(b) provides no law to apply, and therefore the decision to accept the ECA amendment was committed to the Secretary of State's discretion.

    *ii.*    *Complicated Balancing of Factors.*

In *Newman v. Apfel*, the Ninth Circuit explained the second circumstance in which the Supreme Court has determined that the limited exception of judicial nonreviewability pursuant to 5 U.S.C. § 701(a)(2) applies: "that in which the agency's action requires 'a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise' including the prioritization of agency resources, likelihood of success in fulfilling the agency's statutory mandate, and compatibility with 'the agency's overall policies.'"[143]  As the Supreme Court stated in *Heckler*, an "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities."[144]

The Federal Defendants maintain that this exception applies here as well because "broad reservations of discretion to the Executive Branch regarding foreign relations are not uncommon and . . . actions taken pursuant to such reservations typically are exempt from judicial review."[145]  In their Reply, the Federal Defendants identified several factors involved in the Secretary of State's decisions to accept MARPOL Annex amendments, including "evaluation of their individual merits, the effect

---

[143] *Newman v. Apfel*, 223 F.3d 937, 943 (9th Cir. 2000) (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985); *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993)).

[144] *Heckler*, 470 U.S. at 831-32.

[145] Docket 52 at 43.

that the amendment would have on the United States and our interests, including our efforts under MARPOL, and the effect on other countries and our relations with them."[146]

However, *Heckler* applied this exception specifically to an agency's decision not to act.[147] Following *Heckler*, the Ninth Circuit has emphasized that this exception is "limited to those situations in which there is no meaningful standard against which to judge an agency's decision not to act."[148] The facts of this case do not fit within that framework. Although the acceptance of the ECA amendment was technically made through a lack of objection, the Court considers it an affirmative decision by the Secretary of State to accept the amendment. Accordingly, the Court finds that the complicated balancing of factors exception does not apply to the facts of this case.

### C. Conclusion as to SAC Claim 1.

For the foregoing reasons, Claim 1 of the SAC is dismissed for lack of subject matter jurisdiction. Accordingly, the Court will not address Defendants' alternative arguments under Rule 12(b)(6).

## III. SAC Claim 2 and Intervenor Complaint Claims 1–3.

The second cause of action in the SAC asserts that "[u]nder the Treaty Clause and the separation of powers doctrine, the Secretary of State and EPA cannot unilaterally convert an international obligation like the ECA amendment into domestic

---

[146] Docket 93 at 28.

[147] *Heckler*, 470 U.S. at 831; *cf. Lincoln*, 508 U.S. at 193 (applying exception to decision not to allocate funds from a lump-sum appropriation to a specific program).

[148] *Port of Seattle, Wash. v. F.E.R.C.*, 499 F.3d 1016, 1027 (9th Cir. 2007) (citing *Heckler*, 470 U.S. at 830).

federal law."[149]  Specifically, it alleges that the Secretary of State's acceptance of the ECA amendment violated the Treaty Clause and therefore "did not create domestic federal law . . . because it was not made by the President with the advice and consent of the Senate" and "was never implemented pursuant to legislation passed by both houses of Congress."[150]  The SAC alleges that to the extent APPS authorized the Secretary of State's actions, "Congress has unconstitutionally yielded its lawmaking powers and the Senate's treaty-making role—and those of future Congresses—to the executive branch."[151]

Similarly, the first cause of action in the Intervenor Complaint asserts that the Secretary of State's failure to obtain the advice and consent of the Senate before accepting the ECA amendment and APPS—to the extent it authorizes such action— violate the Treaty Clause.[152]  The second cause of action asserts that by authorizing the IMO to make domestic federal law, "APPS amounts to an unconstitutional delegation of Congress's lawmaking authority to an unaccountable international organization."[153]  The third cause of action asserts that "[t]o the extent APPS permits the Secretary of State to make the IMO's amendments to Annex VI enforceable domestic law by not rejecting those amendments, Congress unconstitutionally yielded its lawmaking powers and the Senate's treaty-making role to the executive branch," thereby violating the separation of

---

[149] SAC ¶ 52.

[150] SAC ¶¶ 50-51.

[151] SAC ¶ 53.

[152] Intervenor Compl. ¶¶ 32-34.

[153] Intervenor Compl. ¶¶ 36-37.

powers doctrine and rendering EPA's enforcement of the North American ECA unconstitutional.[154]

Together, the Intervenor Complaint's first three causes of action and the SAC's second cause of action assert that the ECA amendment should not be given effect because the Secretary of State lacked the constitutional authority to accept it. The Federal Defendants moved to dismiss all four claims under Rule 12(b)(1) and Rule 12(b)(6). Given the overlapping nature of these claims, the Court addresses them together.

### A. Enforceability of the ECA Amendment in the United States.

The Treaty Clause of the United States Constitution allows the President to make international treaties "by and with the Advice and Consent of the Senate."[155] Two types of treaties can be entered: self-executing and non-self-executing. A treaty is self-executing when it "is 'equivalent to an act of the legislature,' and . . . 'operates of itself without the aid of any legislative provision.'"[156] By contrast, a non-self-executing treaty "may comprise [an] international commitment[] [but is] not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be 'self-executing' and is ratified on these terms.'"[157] The parties agree that MARPOL and Annex VI were enacted into domestic law by APPS. The State

---

[154] Intervenor Compl. ¶¶ 39-40.

[155] U.S. Const. art. II, § 2, cl. 2.

[156] *Medellin v. Texas*, 552 U.S. 491, 505 (2008) (quoting *Foster v. Neilson*, 27 U.S. 253, 314 (1829), *overruled in part by United States v. Percheman*, 32 U.S. 51 (1833)).

[157] *Id.* (quoting *Igartua–De La Rosa v. United States*, 417 F.3d 145, 150 (1st Cir. 2005) (en banc)).

maintains that the subsequent North American ECA amendment at issue in this litigation never came validly into force in the United States, as the Senate did not approve it and Congress did not implement it. The Defendants disagree, maintaining that both the Senate and Congress authorized the Secretary of State to accept the ECA amendment ex ante,[158] and that such approach is constitutionally permissible.

    *i.   Political Question Doctrine.*

    As a jurisdictional threshold matter, the Federal Defendants and the Clean Air Defendants maintain that the political question doctrine bars this Court from reviewing whether an international agreement must follow the advice-and-consent process of the Treaty Clause.[159]

    The Federal Defendants and the Clean Air Defendants rely heavily on *Made in the USA Foundation v. United States*, where the Eleventh Circuit determined that whether the North American Free Trade Agreement ("NAFTA") was a "treaty" and thus subject to the requirements of the Treaty Clause was a nonjusticiable political question.[160] However, *Made in the USA* involved an international commercial agreement, and the parties disagreed over whether it was a treaty or not. Here, no party disputes that MARPOL is a treaty. The question before the Court is whether APPS's delegation of power to the Secretary of State exceeded the bounds of constitutional authority. *Made in the USA* does not resolve this question.

---

[158] "Ex ante" is defined as "[b]ased on assumption and prediction, on how things appeared beforehand, rather than in hindsight." Black's Law Dictionary 642 (9th ed. 2009).

[159] Docket 93 at 30-32; Docket 41 at 15-16.

[160] Docket 71 at 14; Docket 41 at 16 (citing *Made in the USA*, 242 F.3d 1300, 1302, 1312 (11th Cir. 2001)).

The Federal Defendants also make arguments under *Baker* and the Supreme Court's subsequent discussion of *Baker* in *Goldwater v. Carter*, asserting that reviewing this claim would implicate foreign policy and other prudential concerns.[161] However, as discussed above, in *Hopson v. Kreps* the Ninth Circuit held "that the criteria enunciated [in *Baker*] generally do not apply to claims that the executive has exceeded specific limitations on delegated authority."[162] Indeed, the language the Supreme Court used in *Baker* renders the inapplicability of the *Baker* factors to this issue even clearer. The Supreme Court explained that "[t]he doctrine of which we treat is one of 'political questions,' not one of 'political cases.' The courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority."[163] Given this clear directive, the Court agrees with RDC that "[b]ecause the Constitution sets forth the requirement of Senate consent in the Treaty Clause, determining whether the Treaty Clause requires Senate consent to the ECA amendment falls squarely within the Court's province."[164] Thus, the Court has subject matter jurisdiction over this issue and may consider it under Rule 12(b)(6).

ii. *Senate Approval.*

The SAC asserts that the Secretary of State's acceptance of the ECA amendment "did not create domestic federal law under the Treaty Clause . . . because it

---

[161] Docket 71 at 13 (citing *Baker v. Carr*, 369 U.S. 186, 217 (1962); *Goldwater*, 444 U.S. 996, 998 (1979) (Powell, J., concurring)).

[162] 622 F.2d 1375, 1378 (9th Cir. 1980).

[163] *Baker*, 369 U.S. at 217.

[164] Docket 83 at 13.

was not made by the President with the advice and consent of the Senate."[165]  Similarly, RDC asserts that "the Treaty Clause necessarily applies with equal force to treaty *amendments,* preventing them from becoming U.S. law without Senate advice and consent."[166]

Preliminarily, the parties dispute whether Congress intended renewed Senate advice and consent to be part of the acceptance process for MARPOL Annex amendments. The Defendants maintain that the Senate gave its advice and consent when it approved Annex VI with the understanding that future designations of ECAs would not be referred to the Senate for further action.[167] RDC asserts that Congress intended the prospective approval of amendments to apply only to technical amendments to MARPOL.[168]  It cites to the legislative history of the bill that became APPS, H.R. 6665, to support this assertion.[169]  The bill was referred to the House Committee on Merchant Marine and Fisheries, which produced a report recommending its passage.  In the report's section-by-section analysis, the committee commented on the section that later became 33 U.S.C. § 1909.  The committee explained that "[t]his section requires the advice and consent of the Senate to any proposed amendments to

---

[165] SAC ¶ 50.

[166] Docket 61 at 10 (emphasis in original).

[167] *See, e.g.*, Docket 74 at 7.

[168] Docket 83 at 9; *see also* Intervenor Compl. ¶ 17 (citing H.R. Rep. No. 96-1224, at 18, 23 (1980), reprinted in 1980 U.S.C.C.A.N. 4849, 4864, 4869).

[169] Docket 83 at 21-23 (quoting S. Exec. Rep. No. 96-36, at 2 (1980); S. Treaty Doc. No. 108-7, at X (2003); S. Exec. Rep. No. 109-13, at 6 (2006); S. Hrg. No. 109-324 (2005)).

the MARPOL Protocol Articles."[170]  However, it explained that amendments to MARPOL

Annexes were subject to a different process involving the Secretary of State:

> This rapid amendment process provides for relatively rapid updating of technical provisions without requiring the traditional, but more cumbersome, treaty revision process that will still be required for the MARPOL Protocol Articles.  This rapid amendment process is necessary to stay abreast of new technology, thereby ensuring effective control of pollution from ships operating in the marine environment.[171]

The Federal Defendants assert that "RDC fails to acknowledge [a] threshold, dispositive textual issue," which is that a limitation to technical amendments does not appear in the statutory language of APPS.[172]  Rather, they contend, "the ECA amendment fits within the express terms of Section 1909(b)," and "the ECA designation was among the types of amendments *expressly* highlighted by the Senate in its consideration that certain MARPOL amendments would not be brought to the Senate for its advice and consent."[173]  They identify documents in the legislative history of the ratification of Annex VI that support their position,[174] several of which are also cited by

---

[170] H.R. Rep. No. 96-1224, at 18 (1980), reprinted in 1980 U.S.C.C.A.N. 4849, 4864.

[171] *Id.*

[172] Docket 71 at 16.

[173] Docket 71 at 16.

[174] Docket 52-1 at 6 (S. Treaty Doc. No. 108-7, at VI, X (2003) (Secretary of State's letter submitting Annex VI to the President) ("The United States may seek the establishment of $SO_X$ Emission Control Areas in certain areas pursuant to the procedures set out in Appendix III to Annex VI. . . . Pursuant to longstanding practice under the MARPOL Convention, U.S. acceptance of amendments to Annex VI will not require further advice and consent by the Senate.")); S. Exec. Rep. No. 109-13, at 2, 4 (2006) (relying on Secretary of State's submittal letter); S. Hrg. No. 109-324, at 41 (2005) (comments of Senator Biden) ("Amendments to MARPOL Annexes proceed through a simplified amendment procedure [and] U.S. acceptance of amendments to Annex VI would not, therefore, involve Senate consent.").

the Environmental Defendants.[175]    RDC asserts that the Federal Defendants "selectively quote" documents in the legislative history and maintains that a closer look indicates the Senate "understood the executive could implement only certain types of amendments" without additional approval.[176]

The Court finds that overall, the parties' citations clearly indicate the Senate was aware that certain types of amendments would be approved without further Senate involvement.    This Court need not determine exactly what references to "technical" amendments in the House committee report may have meant, as the plain language of the statute is unambiguous and therefore dispositive: 33 U.S.C. § 1909(a) specifically requires "the advice and consent of the Senate" for amendments to MARPOL proper.[177] However, Section 1909(b) expressly exempts certain amendments—including "proposed amendment[s] to Annex I, II, V, or VI to the Convention"—from that requirement.[178]

    iii.    *Congressional Implementation of the ECA Amendment.*

The SAC also asserts that "[t]he ECA amendment . . . never became domestic federal law because it was never implemented pursuant to legislation passed by both

---

[175] Docket 74 at 12-13.

[176] Docket 83 at 21.

[177] 33 U.S.C. § 1909(a).

[178] 33 U.S.C. § 1909(b); 33 U.S.C. § 1909(a) ("A proposed amendment to the MARPOL Protocol received by the United States from the Secretary-General of the International Maritime Organization pursuant to Article VI of the MARPOL Protocol, may be accepted on behalf of the United States by the President following the advice and consent of the Senate, *except as provided for in subsection (b) of this section.*" (emphasis added)).

houses of Congress."[179]   RDC supports the State's arguments in its briefing.[180]  The Federal Defendants disagree, contending that the North American ECA "entered into force for the United States consistent with both the Senate's understanding in giving its advice and consent to Annex VI and with its implementation through [the APPS] legislation passed by both houses of Congress."[181]   The Clean Air Defendants and the Environmental Defendants support the Federal Defendants' position.[182]

The State relies on *Medellin v. Texas* to support its arguments.[183]   *Medellin* involved a judgment of the International Court of Justice ("ICJ"), *Avena*, which resolved a dispute between several Mexican nationals, including Medellin, and the United States. The ICJ found that the United States had violated an article of the Vienna Convention in its dealings with those individuals who had been convicted in state courts within the United States.   The President issued a memorandum stating that the United States would meet its obligations under *Avena* by having state courts give effect to that decision.   Medellin filed a habeas corpus petition in Texas state court seeking to enforce his rights under *Avena.*   The state court dismissed the petition on the grounds that *Avena* and the President's memorandum were not directly enforceable federal domestic law that would preempt the state limitation on the filing of successive habeas petitions. The Supreme Court agreed with the state court.   It explained that the relevant treaty

---

[179] SAC ¶ 51.

[180] Docket 61 at 19-20.

[181] Docket 52 at 45-46.

[182] Docket 41 at 23-24; Docket 57 at 20-23.

[183] Docket 19 at 34-35 (citing *Medellin*, 552 U.S. 491 (2008)).

sources indicated that ICJ judgments were binding only between nations who were parties in the suit. Because *Avena* had not been implemented in the United States through legislation, it was not binding on the state court. The Supreme Court also held that the President's memorandum did not make the *Avena* decision enforceable domestic law because the President was not authorized by the relevant treaty sources or congressional action to implement the judgment.[184]

The Federal Defendants distinguish *Medellin* from the present action, pointing out that *Medellin* turned on whether the relevant treaties were self-executing, as it was undisputed that no implementing legislation existed.[185] Here, by contrast, there is no dispute that MARPOL is non-self-executing and that there is a specific legislative act authorizing its implementation. APPS expressly implements amendments to Annex VI by making it "unlawful to act in violation of the MARPOL Protocol" and by defining "MARPOL Protocol" to include "any modification or amendments to the Convention, Protocols or Annexes which have entered into force for the United States."[186]

The Federal Defendants assert that "[t]o the extent Alaska is arguing that implementing legislation can only render an international commitment enforceable if Congress passes such legislation following the negotiation and conclusion of the international commitment, that is equally wrong. Congressional *ex ante* authorization for international agreements extends to the earliest days of the nation."[187] They cite

---

[184] *Medellin*, 552 U.S. at 506, 523-530.

[185] Docket 52 at 47; *Medellin*, 552 U.S. at 506.

[186] Docket 52 at 46 (quoting 33 U.S.C. §§ 1907(a), 1901(a)(4)-(5)); Docket 57 at 20 (same).

[187] Docket 52 at 46-47; *see also* Docket 71 at 20; Docket 93 at 33.

examples of implementing legislation for other treaties that involved ex ante authorization for entering into and amending international agreements.[188] The Federal Defendants also cite a history of the Secretary of State's acceptance of prior MARPOL Annex amendments under Section 1909(b) that predates the 2008 APPS amendment implementing Annex VI.[189] The Federal Defendants assert that as Congress enacted APPS against this background of ex ante authorization, Congress should be presumed to have intended to preserve it.[190]

The State acknowledges that "it appears that the Executive has accepted regulations and amendments to international agreements and treaties that purport to be domestically enforceable without further action by Congress or even an agency rulemaking."[191] But the State maintains that this history does not establish this practice as lawful, since as the Supreme Court stated in *Medellin*, '[p]ast practice does not, by

---

[188] *E.g.*, 39 U.S.C. § 407(b)(1) (2012) (giving the Secretary of State "the power to conclude postal treaties, conventions, and amendments related to international postal services and other international delivery services"); 16 U.S.C. § 916b (2012) ("The Secretary of State is authorized . . . to present or withdraw any objections on behalf of the United States Government to such regulations or amendments of the schedule to the convention as are adopted by the Commission and submitted to the United States Government in accordance with article V of the [International Convention for the Regulation of Whaling]."); 33 U.S.C. §§ 3803, 3801(3) (2012) (providing the Secretary of Homeland Security "shall administer and enforce" the International Convention on the Control of Harmful Anti-Fouling Systems on Ships, defined to include "its annexes" and "any amendments to the Convention or annexes which have entered into force for the United States").

[189] Docket 71 at 18-19 and citations therein.

[190] Docket 93 at 34 (citing *United States v. Wilson*, 290 F.3d 347, 356 (D.C. Cir. 2002) ("Congress is presumed to preserve, not abrogate, the background understandings against which it legislates.")).

[191] Docket 79 at 37.

itself, create power.'"[192]   However, in making that statement in *Medellin*, the Supreme

Court quoted *Dames & Moore v. Regan*.[193]   The full sentence in *Dames* reads: "Past

practice does not, by itself, create power, but 'long-continued practice, known to and

acquiesced in by Congress, would raise a presumption that the [action] had been

[taken] in pursuance of its consent.'"[194]   Given Congress's long history of enacting

legislation that authorizes the executive branch to accept and render enforceable

amendments to international agreements, and the fact that MARPOL Annex

amendments have been previously enforced through the ex ante authority of 33 U.S.C.

§ 1909(b), the Court finds that Congress should be presumed to have intended that

MARPOL Annex amendments, including the North American ECA, that have been

accepted by the Secretary of State would constitute enforceable domestic law without

further implementation by Congress.

The legislative history of APPS supports this interpretation.   The State asserts

that when the Senate approved Annex VI in 2006, senators stated that Annex VI "'will

require implementing legislation,'" which the State argues indicates they "implicitly

prohibited the executive branch from unilaterally making any of the treaty obligations in

Annex VI—including any obligations flowing from amendments—domestic federal

---

[192] Docket 79 at 37 (quoting *Medellin v. Texas*, 552 U.S. 491, 496 (2008)).

[193] *Medellin*, 552 U.S. at 496 (quoting *Dames*, 453 U.S. 654, 686 (1981)).

[194] *Dames*, 453 U.S. at 686 (quoting *United States v. Midwest Oil Co.*, 236 U.S. 459, 474 (1915)).   The *Dames* Court also quoted Justice Frankfurter's concurrence in *Youngstown Sheet & Tube Co. v. Sawyer*, which states that "a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned . . . may be treated as a gloss on 'Executive Power' vested in the President by § 1 of Art. II."   *Dames*, 453 U.S. at 686 (quoting *Youngstown*, 343 U.S. 579, 610-611 (1952)).

law."[195]  But the Federal Defendants persuasively contend that the State's reliance on this 2006 report is misplaced because it "ignores the chronology of the ratification of Annex VI and amendments to APPS."[196]  First the Senate approved Annex VI, then Congress amended APPS to include Annex VI; thus, at the time of the report cited by the State, Annex VI did indeed still "require implementing legislation."[197]  The Court therefore does not read the Senate report cited by the State as indicating anything beyond a recognition that Annex VI was not self-executing.

Accordingly, the Court finds that when the Senate approved Annex VI, and when Congress passed the amended version of APPS implementing Annex VI, they intended that the Secretary of State's acceptance of an ECA amendment at a future date would be effective domestic law without further Senate approval and would be implemented through the existing version of APPS without further congressional action.

### B. Constitutionality of APPS.

The Court's inquiry does not end with this Court's determination that APPS authorized the Secretary of State to accept the ECA amendment without further congressional action, for Plaintiffs also assert that if APPS is interpreted to permit the executive's ex ante implementation of the ECA amendment, then the statute is unconstitutional because it violates the Treaty Clause.  That Clause accords to the

---

[195] Docket 19 at 36 (quoting S. Exec. Rep. No. 109-13, at 5 (2006)).

[196] Docket 52 at 48.

[197] Docket 52 at 47-48; *see also* Docket 57 at 21 (Environmental Defendants) ("Annex VI was arguably beyond the scope of the Senate's original consent and not covered by APPS because it addressed pollution into the atmosphere rather than the oceans.  Congress thus passed new implementing legislation amending APPS to explicitly include Annex VI.").

President the "Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur."[198]

RDC asserts that "amendment of treaties, no less than initial acceptance, must conform with the Treaty Clause."[199] It maintains that "Congress lacks the power to abrogate the Treaty Clause by legislation, i.e., Congress lacks the power to decide a future class of substantive treaty amendment will not require advice and consent."[200] RDC cites *Clinton v. City of New York*, in which the Supreme Court held the fact "[t]hat a congressional cession of power is voluntary does not make it innocuous. The Constitution is a compact enduring for more than our time, and one Congress cannot yield up its own powers, much less those of other Congresses to follow."[201] The State makes a similar argument, asserting that Congress cannot "evade the constitutional prerequisites for making domestic law" and that other such attempts "have been struck down by the Supreme Court."[202]

Essentially, the State and RDC contend that Congress and the Senate improperly delegated their treaty-approval and legislative powers to the IMO and the executive branch. The Supreme Court has explained that "[t]he Constitution sought to divide the delegated powers of the new federal government into three defined categories, legislative, executive and judicial, to assure, as nearly as possible, that each

---

[198] U.S. Const. art. II, § 2, cl. 2.

[199] Docket 83 at 19 (citing *I.N.S. v. Chadha*, 462 U.S. 919 (1983)).

[200] Docket 83 at 19.

[201] Docket 83 at 19-20 (quoting *Clinton*, 524 U.S. 417, 452 (1998) (Kennedy J., concurring)).

[202] Docket 79 at 36 (citing *Clinton*, 524 U.S. at 438-39).

Branch of government would confine itself to its assigned responsibility."[203] Thus, "[w]hen any Branch acts, it is presumptively exercising the power the Constitution has delegated to it."[204] While "Congress generally cannot delegate its legislative power to another Branch[,] . . . the separation-of-powers principle, and the nondelegation doctrine in particular, do not prevent Congress from obtaining the assistance of its coordinate Branches."[205] A congressional delegation of power is permissible as long as Congress provides "by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform."[206]

Here, Plaintiffs assert that Congress's delegation of authority to the Secretary of State to accept the ECA amendment was unconstitutional under the nondelegation doctrine. "[F]ederal Statutes enjoy a presumption of constitutionality."[207] Thus, the Court considers the parties' arguments with this presumption in mind. Moreover, as the nondelegation doctrine has been applied to overturn a congressional delegation of

---

[203] *Chadha*, 462 U.S. at 951; *cf. In re Nat'l Sec. Agency Telecomms. Records Litig.*, 671 F.3d 881, 895 (9th Cir. 2011) ("The nondelegation doctrine is central to the notion of separation of powers."), *cert. denied*, 133 S. Ct. 421 (2012).

[204] *Chadha*, 462 U.S. at 951.

[205] *Mistretta v. United States*, 488 U.S. 361, 371-72 (1989).

[206] *Mistretta*, 488 U.S. at 372 (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).

[207] *Littlewolf v. Lujan*, 877 F.2d 1058, 1063 (D.C. Cir. 1989); *see also Rostker v. Goldberg*, 453 U.S. 57, 64 (1981) ("Whenever called upon to judge the constitutionality of an Act of Congress—the gravest and most delicate duty that this Court is called upon to perform—the Court accords great weight to the decisions of Congress." (internal citations and quotations omitted)).

power so rarely that commentators and even courts have questioned the doctrine's viability,[208] the Court approaches the issue with caution.

    *i.   Delegation to the IMO.*

    The Intervenor Complaint asserts in its second cause of action that "APPS amounts to an unconstitutional delegation of Congress's lawmaking authority to an unaccountable international organization."[209] RDC has explained that "APPS, at least as Defendants read it, improperly delegates U.S. substantive lawmaking authority to the IMO."[210] RDC asserts that because APPS does not specifically require any affirmative action by the Secretary, the IMO effectively makes law for the United States if the Secretary of State fails to reject a MARPOL Annex amendment.[211] It maintains that "[t]he mere fact that the executive branch has the theoretical right to veto the IMO's legislation before it becomes U.S. law . . . does not make the IMO's conduct any less legislative."[212]

---

[208] *See, e.g., Leslie Salt Co. v. United States*, 55 F.3d 1388, 1396 n.3 (9th Cir. 1995) ("The vitality of the nondelegation doctrine is questionable . . . ."); Eric A. Posner & Adrian Vermeule, *Interring the Nondelegation Doctrine*, 69 U. Chi. L. Rev. 1721, 1722-23 (2002) ("In our view there just is no constitutional nondelegation rule, nor has there ever been. . . . What we argue . . . is that a statutory grant of authority to the executive branch or other agents can never amount to a delegation of legislative power. A statutory grant of authority to the executive isn't a transfer of legislative power, but an exercise of legislative power.").

[209] Intervenor Compl. ¶ 37.

[210] Docket 83 at 25.

[211] Docket 83 at 25; Docket 83 at 27("[I]n Defendants' vision of proper lawmaking, elected U.S. legislators play no role; instead, the IMO can create U.S. law, as long as the executive takes no affirmative action to stop it.").

[212] Docket 83 at 9-10.

The Federal Defendants disagree because "[i]t is not the actions of the IMO, but rather the actions of the executive branch in the international sphere and Congress in the domestic sphere, that result in an amendment like the ECA designation becoming binding and enforceable in the United States."[213] Moreover, the Federal Defendants assert, APPS gives the Secretary of State the ability to reject amendments, which ensures that the executive branch, not the IMO, has the final say over what amendments enter into force for the United States.[214] They maintain that "regardless of what the Secretary must do to accept or decline to accept a given amendment, the Secretary retains discretion to decide whether the United States will be bound by the amendment."[215]

RDC asserts, citing *Wileman Brothers & Elliot, Inc. v. Giannini*, that the Ninth Circuit has held that "failure to exercise a right of disapproval does not have the same legal effect as affirmative approval."[216] In *Wileman,* the Ninth Circuit reviewed fruit maturity standards that had been promulgated by a fruit growers' committee established by the Secretary of Agriculture pursuant to the Agricultural Marketing Agreement Act. The plaintiffs were farmers who sued members of the growers' committee, asserting that committee members had engaged in antitrust violations. The defendant committee members argued they were immune from suit.

---

[213] Docket 71 at 22.

[214] Docket 71 at 23.

[215] Docket 93 at 39-40.

[216] Docket 83 at 26 (citing *Wileman Bros.*, 909 F.2d 332 (9th Cir. 1990)).

The Ninth Circuit first held that because the committee lacked the authority to promulgate fruit maturity standards on its own, the defendants' actions were not covered by the provision of the Act granting immunity to committee members for authorized actions.[217]   The defendants next argued they were immune from suit because the Secretary of Agriculture failed to disapprove of the standards they promulgated.  The applicable regulations provided that "[e]ach and every regulation, decision, determination, or other act of the committee shall be subject to the continuing right of the Secretary [of Agriculture] to disapprove of the same at any time."[218]   The district court had granted a motion to dismiss on this basis, finding that the Secretary's non-disapproval of the regulations precluded liability of the committee members.  The Ninth Circuit reversed.  It noted that under the statutory scheme, the committee itself had promulgated the fruit maturity standards at issue and had not made recommendations to the Secretary, as required by law.  In these circumstances, the court found that the Secretary's non-disapproval "does not legitimize otherwise anticompetitive conduct."[219]

RDC asserts that here, APPS allowed the ECA amendment to enter into force when the Secretary of State failed to reject it.  RDC maintains that under *Wileman Brothers*, this failure to disapprove is not legally equivalent to an affirmative act of acceptance; and that, as a result, APPS impermissibly allowed the IMO—and not the Secretary of State—to create domestic federal law.  However, *Wileman Brothers* did not

---

[217] *Wileman Bros.*, 909 F.2d at 334-36.

[218] *Id.* at 337 (quoting 7 C.F.R. § 916.62).

[219] *Id.* at 337-38.

concern the constitutionality of the legal framework for setting fruit maturity standards. The Secretary of Agriculture's non-disapproval of the fruit maturity standards at issue was relevant only to the extent that it might shield the defendants from liability. Consequently, *Wileman Brothers* does not support RDC's argument that APPS is an unconstitutional delegation to the IMO because it does not require affirmative action by the Secretary of State.

The Court finds that the provisions of 33 U.S.C. § 1909 give the Secretary of State the discretion to accept or reject a MARPOL Annex amendment and do not impermissibly delegate that authority to the IMO.

ii.    *Delegation to the Secretary of State.*

The SAC's second cause of action and the Intervenor Complaint's third cause of action assert that to the extent APPS allows the Secretary of State to accept an amendment to Annex VI that then becomes enforceable domestic law, APPS unconstitutionally yields its lawmaking power and the Senate's treaty-making role to the executive branch.[220]

RDC asserts that "[a]s Defendants describe APPS's operation, the executive branch has sole power to propose amendments to the IMO; the exclusive power to decide whether amendments will become effective for the U.S.; and the power to execute and implement amendments as part of U.S. law."  It maintains that "[t]his sweeping executive authority encompasses legislative power that belongs to Congress."[221]  Similarly, the State "maintains that to comply with the Constitution there

---

[220] SAC ¶ 53; Intervenor Compl. ¶ 40.

[221] Docket 83 at 29.

must be some check on the Executive's authority to unilaterally make domestic law."[222] And RDC asserts that "delegations pass constitutional muster only if 'Congress provides an administrative agency with standards guiding its actions such that a court could ascertain whether the will of Congress has been obeyed.'"[223]

The touchstone for delegations of power is the intelligible principle test.   In *Mistretta v. United States*, the Supreme Court addressed a challenge to the U.S. Sentencing Guidelines, promulgated by the U.S. Sentencing Commission, on separation of powers and nondelegation grounds.[224]   In finding the Guidelines constitutional, the Court explained that "in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives."[225]   A delegation is "constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority."[226]   The Court provided some perspective on the nondelegation doctrine, explaining that even "broad delegations" had traditionally been upheld.[227]   The Ninth Circuit has commented

---

[222] Docket 79 at 38.

[223] Docket 83 at 29-30 (quoting *Skinner v. Mid-Am. Pipeline Co.*, 490 U.S. 212, 218 (1989)).

[224] 488 U.S. 361 (1989).

[225] *Id.* at 372.

[226] *Id.* at 372-73 (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)).

[227] *Id.* at 373-74.

that "[w]ith respect to federal agencies, only very broad, literally standardless grants of legislative power will offend the Constitution."[228]

Here, the Federal Defendants assert that "the limitation of [the Secretary of State's] discretion to specified annexes to MARPOL, and hence to the type and content of amendments that would be proposed to those annexes, provides a bounded and intelligible principle."[229] In addition, they assert that "MARPOL's explicit requirement that annex amendments [be] related to the substance of the annex and consistent with the MARPOL Convention framework further limits the area in which the Secretary of State may exercise . . . discretion."[230]

As discussed above, the Court has determined that 33 U.S.C. § 1909(b) does not contain any "judicially manageable or discoverable standards" by which the Court could evaluate the Secretary of State's decision.[231] However, this ruling does not preclude a determination that Section 1909(b) provides an intelligible principle and boundaries limiting the Secretary of State's discretion. While Sections 1909(b) and (c) do not limit *how* or *why* the Secretary of State determines to accept or reject an amendment, it does limit *what* the Secretary of State can accept or reject: the Secretary of State may act only on an amendment that has gone through the process outlined in Appendix III and that has been vetted and accepted by the IMO. Accordingly, although the Secretary of State is not under a duty to apply the Appendix III criteria independently, those criteria

---

[228] *Wileman Bros. & Elliott, Inc. v. Giannini*, 909 F.2d 332, 337 n.9 (9th Cir. 1990).

[229] Docket 52 at 56; *see also* Docket 71 at 27.

[230] Docket 52 at 56; *see also* Docket 71 at 27.

[231] *See supra* at 18-28.

still—by the fact of their integration into the Appendix III process—provide a boundary and intelligible principle that renders the delegation to the Secretary of State in Section 1909(b) constitutional.[232]

Moreover, "[t]he Supreme Court has repeatedly underscored that the intelligible principle standard is relaxed for delegations in fields in which the Executive has traditionally wielded its own power."[233]   Likewise, the Ninth Circuit has held that "congressional legislation which is to be made effective through negotiation and inquiry within the international field must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved."[234]

The Federal Defendants assert that "[h]ere, Alaska's challenge is to a statutory provision addressing the Secretary of State's actions with respect to a treaty."[235]   RDC maintains that "[t]he ECA amendment, as it applies to U.S. waters, amounts to nothing

---

[232] *Cf. Touby v. United States*, 500 U.S. 160, 165 (1991) ("So long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform, such legislative action is not a forbidden delegation of legislative power.'" (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928))); Docket 52 at 57 ("By referencing the policy aims, structure, and content of MARPOL, identifying the Secretary of State as the relevant executive branch actor, and specifying that the Secretary of State may take 'appropriate action' with respect to a defined subset of amendments within the framework of MARPOL, the Senate and Congress have provided an intelligible principle to delineate the boundaries of the authority described in APPS.").

[233] *In re Nat'l Sec. Agency Telecomms. Records Litig.*, 671 F.3d 881, 897-98 (9th Cir. 2011) (citing *Loving v. United States*, 517 U.S. 748, 772 (1996); *United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 324 (1936); *Freedom to Travel Campaign v. Newcomb*, 82 F.3d 1431, 1438 (9th Cir.1996)), *cert. denied*, 133 S. Ct. 421 (2012).

[234] *Jensen v. Nat'l Marine Fisheries Serv.*, 512 F.2d 1189, 1191 (9th Cir. 1975) (quoting *Curtiss-Wright Corp.*, 299 U.S. at 320).

[235] Docket 52 at 58.

more (or less) than traditional environmental legislation, the substantive effects of which the U.S. could have accomplished through traditional domestic means, not through an international treaty."[236]  However, this assertion overlooks that the United States jointly proposed the ECA amendment with Canada, and the Secretary of State's acceptance of the ECA amendment fulfilled the international commitments the United States had made under MARPOL.

RDC maintains that the Federal Defendants "rely on authorities involving the [executive's] power to take actions to promote the national security or respond to wartime situations, circumstances obviously not present here."[237]  While RDC is correct that this case does not implicate national security or wartime powers, the executive's power to conduct foreign affairs is well-established.  The Supreme Court has held that:

> Although the source of the President's power to act in foreign affairs does not enjoy any textual detail, the historical gloss on the "executive Power" vested in Article II of the Constitution has recognized the President's "vast share of responsibility for the conduct of our foreign relations."  While Congress holds express authority to regulate public and private dealings with other nations in its war and foreign commerce powers, in foreign affairs the President has a degree of independent authority to act.[238]

---

[236] Docket 83 at 37.

[237] Docket 83 at 36.

[238] *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414 (2003) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–611 (1952) (Frankfurter, J., concurring)); *see also, e.g.*, *Zemel v. Rusk*, 381 U.S. 1, 17 (1965) ("Congress—in giving the Executive authority over matters of foreign affairs—must of necessity paint with a brush broader than that it customarily wields in domestic areas."); *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 109 (1948) ("The President . . . possesses in his own right certain powers conferred by the Constitution on him as Commander-in-Chief and as the Nation's organ in foreign affairs.").

Particularly in light of the clear commitment of foreign affairs to the executive branch, and the limitations on the Secretary of State's actions implicit in 33 U.S.C. § 1909, the Court finds that APPS does not violate the nondelegation doctrine.

It follows that by allowing the Secretary of State to accept the ECA amendment, Congress did not circumvent or ignore the requirements of the Treaty Clause; rather, through their ex ante approval of future MARPOL Annex amendments, the Senate and Congress constitutionally delegated their powers to the Secretary of State.

### C. Conclusion as to SAC Claim 2 and Intervenor Complaint Claims 1–3.

Given the foregoing analysis, the Court finds that the SAC's second cause of action and the Intervenor Complaint's first, second, and third causes of action fail to state a claim upon which relief can be granted and thus merit dismissal under Rule 12(b)(6).

## IV. SAC Claim 4.

The parties agree that the ECA amendment, and not any action by EPA, designated the North American ECA. Accordingly, the State has voluntarily dismissed the SAC's third cause of action.[239] The fourth cause of action in the SAC asserts that the North American ECA does not apply to foreign-flagged ships because EPA failed to designate the ECA through a rulemaking, which the State asserts is required by 33 U.S.C. §§ 1902 and 1903.[240] The Court evaluates this cause of action under Rule 12(b)(6).

---

[239] Docket 79 at 41.

[240] SAC ¶¶ 58-61.

33 U.S.C. § 1902(a)(5)(A) provides that Annex VI shall apply to foreign-flagged ships that are "in a port, shipyard, offshore terminal, or the internal waters of the United States."[241]  33 U.S.C. § 1902(a)(5)(B) and (C) provide that Annex VI shall also apply to foreign-flagged ships that are "bound for, or departing from, a port, shipyard, offshore terminal, or the internal waters of the United States," and to ships "entitled to fly the flag of, or operating under the authority of, a party to Annex VI," that are in:

> (i) the navigable waters or the exclusive economic zone of the United States;
>
> (ii) an emission control area designated pursuant to section 1903 of this title; or
>
> (iii) any other area that the Administrator, in consultation with the Secretary and each State in which any part of the area is located, has designated by order as being an area from which emissions from ships are of concern with respect to protection of public health, welfare, or the environment.[242]

The State construes this statute to mean that "APPS only applies to foreign-flagged ships when those ships are in an ECA 'designated under section 1903' of APPS."[243]  33 U.S.C. § 1903 does not specifically discuss ECA designations or rulemaking procedures, but rather it generally provides that the Administrator of EPA "shall have authority to administer regulations 12, 13, 14, 15, 16, 17, 18, and 19 of Annex VI to the Convention" and "shall also prescribe any necessary or desired regulations to carry out the provisions of regulations 12, 13, 14, 15, 16, 17, 18, and 19 of Annex VI to the

---

[241] 33 U.S.C. § 1902(a)(5)(A).

[242] 33 U.S.C. § 1902(a)(5)(B)(i)-(iii), (a)(5)(C)(i)-(iii).

[243] Docket 19 at 38.

Convention."[244]  Regulation 14 of Annex VI is the part of Annex VI that governs $SO_x$ emission requirements, including those applied within ECAs.[245]

The Federal Defendants maintain that Alaska's "assertion that ECAs need to be designated through an EPA rulemaking under section 1903 of APPS is simply incorrect under the APPS' terms and, even if such rulemaking were necessary, the APA's 'foreign affairs' exception exempts such actions from notice and comment requirements."[246]

The Environmental Defendants assert that "[b]ecause the list of areas [in 33 U.S.C. § 1902] is disjunctive, if a foreign-flagged ship is in any one of the areas described it is subject to the Act."[247]  Thus, APPS applies to foreign-flagged ships operating within "the navigable waters or the exclusive economic zone of the United States."[248]  The United States' Exclusive Economic Zone ("EEZ") "begins at the outer limit of the territorial sea and extends 200 miles from the baseline of the coastal

---

[244] 33 U.S.C. § 1903(b)(2), (c)(2).

[245] Docket 9-3 at 16 (MARPOL Annex VI, Reg. 14).

[246] Docket 49 at 16.

[247] Docket 57 at 26.

[248] 33 U.S.C. § 1902(a)(5)(B)(i)-(ii), (a)(5)(C)(i)-(ii).

state."[249]  The United States and Canada's North American ECA proposal states that "the proposed ECA will extend 200 nautical miles from the territorial sea baseline."[250]

In the Marine Diesel Rule, EPA explained that the Rule applied within the North American ECA submitted to the IMO, which it described as follows:  "The area included in the North American ECA submittal to IMO for ECA designation generally extends 200 nautical miles from the coastal baseline."[251]  The Environmental Defendants and the Federal Defendants assert that the North American ECA—as designated by the IMO, implemented through APPS, and applied by EPA—is contained within the United States' EEZ, and thus APPS and the ECA amendment apply to foreign-flagged ships under 33 U.S.C. § 1902(a)(5)(B)(i) and (a)(5)(C)(i).[252]

The State argues that under this interpretation, the "latter sections [that] also apply APPS to foreign-flagged ships in 'an emission control area designated under section 1903' would not add anything to the reach of APPS because the United States cannot designate by domestic rulemaking an ECA applying to foreign-flagged ships outside the navigable waters or exclusive economic zone of the United States."[253]  The

---

[249] Thomas J. Schoenbaum, 1 Admiralty & Mar. Law § 2-16 (5th ed.); *see also* 16 U.S.C. § 1453 (2012) ("The Exclusive Economic Zone extends to a distance 200 nautical miles from the baseline from which the breadth of the territorial sea is measured."); Pres. Proc. No. 5030, 48 Fed. Reg. 10605, 10605 (Mar. 10, 1983) ("The E[xc]lusive Economic Zone extends to a distance 200 nautical miles from the baseline from which the breadth of the territorial sea is measured.").

[250] North American ECA Proposal at 5, *available at* http://www.epa.gov/nonroad/marine/ci/mepc-59-eca-proposal.pdf.

[251] Marine Diesel Rule, 75 Fed. Reg. 22896, 22924 (Apr. 30, 3010).

[252] Docket 52 at 62; Docket 57 at 25-26.

[253] Docket 79 at 44.

State urges the Court to "reject a reading of APPS that renders some of its sections superfluous."[254]   The Federal Defendants respond that their position does not render parts of Section 1902 superfluous.   They maintain that "Sections 1902(a)(5)(B)(ii), (C)(ii), and (D)(iii) provide additional jurisdiction where an ECA has been designated pursuant to section 1903 of APPS."[255]   The Federal Defendants further assert that "[a]ny discussion of how [these] subsections . . . apply and what areas might be designated pursuant to section 1903 is irrelevant to the analysis of the North American ECA, and an explanation of how these subparts might operate in hypothetical circumstances will not help the Court resolve the issues before it."[256]

The Court finds that the plain language of 33 U.S.C. § 1902 applies Annex VI to vessels within the United States EEZ and navigable waters, without exception.[257] Moreover, 33 U.S.C. § 1902 was drafted before the North American ECA had been adopted by the IMO and implemented in the United States; thus, at the time of its drafting, the language regarding the ECA would not have been superfluous, as the boundaries of the North American ECA were yet unknown.   The Court's interpretation renders a rulemaking under Section 1903 unnecessary, as Section 1902's provisions

---

[254] Docket 79 at 44.

[255] Docket 93 at 47.

[256] Docket 93 at 47.

[257] *Cf.* H.R. Rep. No. 110-54, at 5 (2007), reprinted in 2008 U.S.C.C.A.N. 1002, 1003 (section-by-section analysis) ("This section applies Annex VI to the U.S. Exclusive Economic Zone to the extent that this is consistent with international law.").

regarding the EEZ provide adequate statutory authority to apply the North American ECA to foreign-flagged ships.[258]

Accordingly, the Court finds that the State, with respect to its fourth cause of action, has failed to state a claim upon which relief can be granted. The Federal Defendants' Motion to Dismiss is therefore GRANTED with regard to this claim.

## CONCLUSION

For the foregoing reasons, the Court orders as follows:

1.    The Federal Defendants' Motion to Dismiss Alaska's Second Amended Complaint at Docket 48 is GRANTED.

2.    The Federal Defendants' Motion to Dismiss Complaint in Intervention of Intervenor-Plaintiff Resource Development Council for Alaska at Docket 70 is GRANTED.

3.    The State of Alaska's Motion for Preliminary Injunction at Docket 15 is DENIED as moot.

4.    The Clerk of Court is directed to enter a Judgment in accordance with this Order.

DATED at Anchorage, Alaska this 17th day of September, 2013.

/s/ Sharon L. Gleason
United States District Judge

---

[258] In addition, as the Federal Defendants explain, under the State's interpretation "the United States could enforce an ECA's requirements as to foreign-flagged ships in an ECA designated pursuant to section 1903, but not as to foreign-flagged ships in an ECA located in a port or internal waters or in the United States EEZ or navigable waters and designated by amendment to MARPOL Annex VI." Docket 93 at 48-49. They also point out that as a practical matter, it makes little sense for Congress to require the greater domestic protections of notice-and-comment rulemaking "to enforce the ECA as to ships of other parties to Annex VI in the ECA but not as to United States ships." Docket 93 at 49.